1999 UT 65

Cyndi W. GILBERT, Plaintiff and Appellant,

v.

Paul R. INCE and Callister, Nebeker & McCullough (fka Callister, Duncan & Nebeker), a Utah professional corporation, Defendants and Appellees.

No. 970392.

Supreme Court of Utah.

July 2, 1999.

Scott M. Lilja, Jonathan Hawkins, Salt Lake City, for plaintiff.

Stephen G. Morgan, Cynthia K.C. Meyer, Jeffrey C. Miner, Salt Lake City, for defendants.

RUSSON, Justice:

¶1 Plaintiff Cyndi W. Gilbert appeals from a verdict in favor of defendants Paul R. Ince and the law firm of Callister, Nebeker & McCullough. Gilbert brought suit against defendants, alleging they had wrongfully used civil proceedings in filing and maintaining a malpractice action against her. The trial court conducted a jury trial and, at the conclusion of Gilbert's case in chief, granted defendants' motion for a directed verdict. We affirm.

## BACKGROUND

¶2 Cyndi Gilbert is an attorney, as was Paul R. Ince at the time the relevant events in this case occurred. Ince was a shareholder of the firm Callister, Nebeker & McCullough (formerly known as Callister, Duncan & Nebeker). The events giving rise to this case primarily concern the financial affairs of Dr. Charles E. Gunnoe. Gilbert and Ince acted as Gunnoe's attorney on separate occasions, representing his interests as a claimant in different bankruptcy proceedings. Gilbert began representing Gunnoe in early 1986 with respect to Gunnoe's interest in real property held by an entity known as Mountain View Holdings Ltd. Ince began representing Gunnoe in mid-1990 with respect to Gunnoe's interests in assets held by Brian Head Enterprises, Inc.

¶3 A complicated series of events linked the two bankruptcy proceedings, which resulted in Gunnoe's filing suit against Gilbert for malpractice in September of 1990. The malpractice complaint—prepared and signed by Ince in his capacity as Gunnoe's attorney—consisted of two essential claims: breach of contract and conflict of interest. In substance, the complaint alleged that Gilbert's failure to adequately represent Gunnoe in earlier dealings related to the Mountain View bankruptcy had compromised Gunnoe's position in the Brian Head bankruptcy. The district court granted summary judgment in Gilbert's favor as to the conflict of interest claim. Gunnoe then agreed to dismiss his breach of contract claim in June of 1994.

¶4 In October of that same year, Gilbert filed the instant suit against Ince, alleging that Ince's actions in bringing the malpractice suit on Gunnoe's behalf constituted wrongful use of civil proceedings. Because the events preceding Gilbert's representation of Gunnoe and the events surrounding Gunnoe's subsequent malpractice suit are important to an understanding of the case, we recite them in some detail.

¶5 Prior to retaining Gilbert, Gunnoe had maintained a longstanding and complex financial relationship with Burton K. Nichols and Brian Head Enterprises. Gunnoe held a promissory note for a substantial debt that Brian Head owed him. The note was secured by a trust deed on property known as the Woodbridge Subdivision. Nichols and Brian Head held a similar security interest in the aforementioned Mountain View property. In 1985, Nichols offered to assign Brian Head's Mountain View interest to Gunnoe if Gunnoe would execute a release of his interest in the Woodbridge property. Because of Gunnoe's longstanding relationship with Nichols, Gunnoe agreed to the exchange.

¶6 Apparently both the Mountain View and the Woodbridge properties constituted adequate collateral for the original debt. However, Mountain View Holdings, Ltd., was in the midst of chapter 11 bankruptcy proceedings, and the Mountain View property was encumbered by a tax lien in the amount of $75,000. Brian Head agreed to make the tax payments so that Gunnoe would not become liable for them in the event he foreclosed on the collateral. To guarantee payment of the taxes, Nichols represented that Brian Head would grant Gunnoe a further security interest in ski equipment possessed by Brian

Head. Although Gunnoe and Nichols arrived at a verbal understanding of their agreement, they did not immediately complete the documents necessary to effect the transfer of the property interests, nor did they draft a security agreement covering the ski equipment.

¶ 7 The bankruptcy court was notified that Gunnoe was to be substituted as a claimant in the Mountain View proceedings. Nichols recommended that Gunnoe retain Cyndi Gilbert (then Cyndi Woodbury[1]) to represent Gunnoe's interest in the Mountain View bankruptcy. Gunnoe was aware that Gilbert had previously represented Nichols and Brian Head in a number of other matters.

¶ 8 While Gilbert was representing Gunnoe in the Mountain View bankruptcy, Brian Head sent her a UCC–1 financing statement covering its ski equipment and a request for reconveyance of Gunnoe's rights in the Woodbridge property. Because Gilbert had not been privy to the original negotiations between Gunnoe and Nichols, she wrote to Gunnoe, stating, "It is my opinion that we need to draft an agreement between you and [Brian Head] covering the 'technical' points of this new arrangement." She requested that Gunnoe send her information detailing his understanding of the agreement and also sent a similar request to Brian Head. She received some information from Gunnoe but no information from Brian Head. Gilbert asserts that she contacted the Secretary of State[2] and was told that there were no prior liens on Brian Head's ski equipment. However, she did not request or obtain any written documentation. Gilbert forwarded the Woodbridge reconveyance to Brian Head af-

ter Gunnoe signed it and filed the UCC–1 financing statement but otherwise took no further action to document or investigate the nature of the agreement between Gunnoe and Nichols.

¶ 9 In 1990, Brian Head filed for bankruptcy and Gunnoe retained Ince to represent his interests. The Brian Head trustee filed an objection to Gunnoe's claimed $75,000 security interest in the ski equipment. Among other grounds for the objection, the trustee revealed that an entity known as SISCorp held a prior perfected security interest that completely encumbered the ski equipment.

¶ 10 Ince contacted Gilbert and informed her that he was considering a malpractice action for her failure to assure that Gunnoe had a perfected security interest in the ski equipment. However, Ince also stated that there was a pending stipulation before the bankruptcy court that could potentially satisfy Gunnoe's claims and, if the stipulation was approved, he believed a malpractice action would be of no benefit to his client. He told her that he needed to decide within a few days whether to file suit against her because the statute of limitations was about to expire. He requested that Gilbert waive the statute of limitations until after the bankruptcy court had dealt with the proposed stipulation. Gilbert refused to waive the statute of limitations, and Ince filed the action for malpractice three days later, on September 28, 1990.

¶ 11 The malpractice suit consisted of two essential claims: (1) failure to perform contractual duties, and (2) breach of fiduciary duty due to conflict of interest.[3] The first claim related to Gilbert's alleged failure to

---

1. Cyndi Woodbury married and changed her name to Gilbert only shortly before the malpractice suit was filed. Hence, during most of the relevant underlying events she still used Woodbury as her name. To avoid confusion, we will refer to her by the name under which she filed suit in this case.

2. The source and validity of the information Gilbert claims she received is unclear from the record. The Secretary of State previously received filings to perfect security interests. As of July 1, 1984, however, the legislature vested that responsibility in the Division of Corporations and Commercial Code. *See* 1984 Utah Laws ch. 66,

§ 192, codified at Utah Code Ann. § 70A–9–401 (1997).

3. The complaint also denominated "partnership liability" as a third cause of action and named several lawyers who had shared an office with Gilbert during the period when she represented Gunnoe. "Partnership liability," however, is a theory of liability describing the persons who may be sued, not a distinct cause of action. *Cf. Richardson v. Matador Steak House, Inc.*, 948 P.2d 347, 348 n. 1 (Utah 1997). None of the purported partners was ever served with summons or a copy of the complaint.

"detect or disclose" SISCorp's senior perfected security interest in the ski equipment and her alleged failure to assure that Gunnoe's own interest in the same equipment was established or preserved. The second claim asserted that Gilbert had acted to protect Nichols' and Brian Head's interests in violation of her duty of loyalty to Gunnoe.

¶ 12 In January 1991, the bankruptcy court approved a stipulation whereby Gunnoe received an undisputed but unsecured claim in the amount of $100,000.[4] Shortly thereafter, in February of 1991, the district court dismissed the malpractice suit against Gilbert because Ince had failed to serve her with a summons and a copy of the complaint within 120 days. In March of 1991, Ince filed an ex parte motion for relief from the dismissal. The court granted the motion. Ince then served Gilbert in April of 1991, and the malpractice suit proceeded. Thereafter, Gilbert moved for summary judgment, which the district court granted on the conflict of interest claim.[5] Gunnoe subsequently obtained new counsel and agreed to a dismissal with prejudice of the remainder of the suit.

¶ 13 Within a few months of the dismissal of the malpractice suit, Gilbert instituted the present action against Ince and the law firm of Callister, Nebeker & McCullough for wrongful use of civil proceedings. The district court conducted a jury trial that spanned several days. At the conclusion of Gilbert's case in chief, Ince and his law firm moved for a directed verdict. The court ruled on the motion as follows:

> Defendants' motion for directed verdict on the issue of probable cause is granted and Plaintiff's complaint is hereby dismissed with prejudice and on the merits for failure of plaintiff to prove that defendants lacked

probable cause in filing the underlying malpractice complaint on behalf of Dr. Gunnoe against Ms. Gilbert.

Gilbert appeals from this judgment.

## DISCUSSION

¶ 14 A directed verdict at the close of a plaintiff's case in chief assumes that the plaintiff has not met his or her burden of proof. Thus, "in reviewing a grant of a directed verdict, we view all facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Nay v. General Motors Corp.*, 850 P.2d 1260, 1261 (Utah 1993). "We reverse a directed verdict when the evidence [so viewed] is sufficient to permit a reasonable jury to find for the nonmovant." *Id.* at 1263.

¶ 15 This court has only infrequently treated the tort of wrongful use of civil proceedings, and only once have we discussed the action under that particular label. *See Baird v. Intermountain Sch. Federal Credit Union*, 555 P.2d 877, 878 (Utah 1976) (referring to suit for "wrongful bringing of civil proceedings"). More commonly, we have addressed it—and actions similar to it—under the rubric of "abuse of process" or "malicious prosecution." *See, e.g., Smith v. Vuicich*, 699 P.2d 763, 764 (Utah 1985) (per curiam); *Nelson v. Jacobsen*, 669 P.2d 1207, 1216 (Utah 1983); *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 308–09 (Utah 1982); *Corporation of the Pres. of the Church of Jesus Christ of Latter–Day Saints v. Wallace*, 573 P.2d 1285, 1288 (Utah 1978); *Crease v. Pleasant Grove City*, 30 Utah 2d 451, 455, 519 P.2d 888, 890 (1974); *Johnson v. Mount Ogden Enters., Inc.*, 23 Utah 2d 169, 172–73, 460 P.2d 333, 334–35 (1969).[6] These cases addressed malicious prosecution and abuse of

---

4. According to Ince's later testimony, the $100,000 was in satisfaction of the $75,000 claim, plus a "fudge factor." Ince does not explain the nature of this "fudge factor," but it apparently related to the fact that interest had continued to accrue for a time on the Mountain View improvement bonds. Gunnoe eventually paid slightly more than $82,000 to satisfy the tax obligation. Because his unsecured claim was not fully funded in the bankruptcy, he ultimately received only $15,000. Whether his status would have improved if he had been an undisputed secured (though junior) creditor is not clear.

Neither party has cited any substantial evidence in the record relating to that question.

5. The court also granted summary judgment on the asserted "partnership liability" claim.

6. These torts should not be confused with statutes imposing criminal liability for improper use or manipulation of judicial proceedings. *See, e.g.,* Utah Code Ann. § 76–8–601 (Supp.1998) (misdemeanor penalty for wrongful commencement of action in justice court).

process in cursory terms, and often in a tangential manner. Consequently, they made little effort to articulate differing criteria applicable to civil versus criminal contexts or to the improper initiation of lawsuits versus the misuse of properly procured legal process for other than its intended purpose.[7]

¶ 16  It is the substance of the action with which we are concerned rather than the label applied.[8]  Nevertheless, because different standards may apply to differing contexts, we briefly note the relevant distinctions for analytical clarity.  The Restatement (Second) of Torts provides a useful framework for treating three separate categories of similar but distinct torts involving abusive manipulation of public judicial resources.  They are (1) abuse of process, (2) malicious prosecution, and (3) wrongful use of civil proceedings.

█  ¶ 17  As understood by the Restatement, abuse of process applies to "[o]ne who uses a legal process ... against another primarily to accomplish a purpose for which it is not designed."  Restatement (Second) of Torts § 682 (1997);. see also Wallace, 573 P.2d at 1288; Johnson, 23 Utah 2d at 172–73, 460 P.2d at 334–35.  Abuse of process, as a term of art, is more narrowly construed by the Restatement than by many of our prior cases, which tended to employ it as a catch-all description of any private misuse of judicial resources.

█  ¶ 18  Under the Restatement, malicious prosecution relates only to criminal actions and pertains to a private person who improperly "initiates or procures the initiation of criminal proceedings against another who is not guilty of the offense charged."  Restatement (Second) of Torts § 653; see also Hodges v. Gibson Prods. Co., 811 P.2d

151, 158–59 (Utah 1991); Crease, 30 Utah 2d at 455, 519 P.2d at 890; Schettler, 768 P.2d at 959.  Typically, then, malicious prosecution applies to the circumstance when a person with improper motive falsely accuses another individual of a crime.  See generally Restatement (Second) of Torts §§ 653–73.

█  ¶ 19  The Restatement denominates wrongful use of civil proceedings as the civil counterpart to malicious prosecution.  It consists in instituting or maintaining civil proceedings for an improper purpose and without a justifiable basis.  See id. §§ 674–681B; see also Vuicich, 699 P.2d at 764; Isom, 657 P.2d at 308–09; Baird, 555 P.2d at 878; Olch, 955 P.2d at 367; Keller, 896 F.Supp. at 1570–71.  The Restatement describes the pertinent criteria for wrongful use of civil proceedings as follows:

> One who takes an active part in the initiation, continuation, or procurement of civil proceedings against another is subject to liability to the other for wrongful civil proceedings if (a) he [or she] acts without probable cause, and primarily for à purpose other than that of securing the proper adjudication of the claim in which the proceedings are based, and (b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought.

Restatement (Second) of Torts § 674.  The Restatement also defines "probable cause" in the context of wrongful use of civil proceedings:

> One who takes an active part in the initiation, continuation or procurement of civil proceedings against another has probable cause for doing so if he [or she] reasonably

7.  More recent cases in the Utah Court of Appeals and the United States District Court for the District of Utah have recognized important distinctions between actions for improper initiation of criminal or civil proceedings and actions for misuse of judicial process otherwise properly procured. See, e.g., Brown's Shoe Fit Co. v. Olch, 955 P.2d 357, 367 (Utah Ct.App.1998); Amica Mutual Ins. Co. v. Schettler, 768 P.2d 950, 959–60 (Utah Ct.App.1989); Keller v. Ray, Quinney & Nebeker, 896 F.Supp. 1563, 1570–71 (D.Utah 1995).  However, even the more recent cases do not always employ the same nomenclature. Kel-

ler, for instance, appears to treat civil and criminal proceedings under a common rubric of "malicious prosecution."  896 F.Supp. at 1570.

8.  For this reason, our opinion clarifying the appropriate nomenclature in the common law civil context should not be interpreted as altering the meaning of any statute or other law that has traditionally employed terms such as "abuse of process" or "malicious prosecution." See, e.g., Utah Code Ann. § 63–30–10(2) (1997) (listing exceptions to waiver of governmental immunity).

believes in the existence of the facts upon which the claim is based, and . . . correctly or reasonably believes that under those facts the claim may be valid under the applicable law.

Restatement (Second) of Torts § 675.[9] These criteria generally are in accord with our prior cases. As we stated in *Baird v. Intermountain School Federal Credit Union*, 555 P.2d 877 (Utah 1976), an action for

wrongful bringing of civil proceedings . . . is related to and arose as an adjunct to the action for malicious prosecution in criminal proceedings and is related thereto. But it is recognized only when the civil suit is shown to have been brought without probable cause, for the purpose of harassment or annoyance; and it is usually said to require malice.

*Id.* at 878 (footnotes omitted).[10] Notably, *Baird* cited section 674 of the Restatement as authority. *See id.* n. 3. Similarly, our other cases treating allegations of abusive use of civil proceedings, while often labeling them in a different and sometimes inconsistent manner, generally implied that the tort required a showing of improper purpose and lack of a justifiable basis for instituting or maintaining the underlying action. *See, e.g., Vuicich*, 699 P.2d at 764; *Isom*, 657 P.2d at 308–09; *see also Olch*, 955 P.2d at 367 n. 12 (citing Restatement (Second) of Torts § 674); *Schettler*, 768 P.2d at 959 (citing same); *Keller*, 896 F.Supp. at 1570 (describing distinc-

tion between abuse of process and misuse of civil or criminal proceedings). To preserve analytical clarity with respect to the species of torts permitting suit for misuse of judicial proceedings, we apply the Restatement's formulation of wrongful use of civil proceedings.[11]

¶ 20 Gilbert thus had the obligation of proving that Ince acted "without probable cause and primarily for a purpose other than that of securing the proper adjudication of the [malpractice] claim."[12] Restatement (Second) of Torts § 674(a). We conclude that the district court correctly rendered a directed verdict in favor of defendants Ince and the firm of Callister, Nebeker & McCullough because Gilbert failed to present evidence upon which the court or the jury could rule in her favor.[13]

¶ 21 The fundamental dispute giving rise to the malpractice lawsuit concerned the scope of Gilbert's representation of Gunnoe and her diligence in maintaining the appropriate degree of loyalty to him. Gunnoe's malpractice suit alleged that Gilbert failed to perform her contractual duties as an attorney and acted under a conflict of interest. We will address probable cause in relation to both allegations.

■ ¶ 22 Gunnoe communicated to Ince that he believed Gilbert should have informed him of his status as a secured credi-

---

9. There is another subsection to this provision, relating to nonattorney litigants who rely in good faith upon advice of counsel.

10. *Baird*'s only apparent variation from the current Restatement standard is its implication that a suit for wrongful civil proceedings, in the "most unusual circumstances," could be maintained without a showing that the underlying action terminated in favor of the person against whom it was brought, *see* 555 P.2d at 878, whereas the Restatement specifically requires such a showing if the action was brought ex parte or with the assistance of counsel. *See* Restatement (Second) of Torts § 674(b). *Baird* did not elucidate what might constitute such "unusual circumstances."

11. This is not to say that we adopt all the attendant Restatement commentary relating to the tort of wrongful use of civil proceedings or the analysis of other courts that have cited the Restatement's standard.

12. It is undisputed that the underlying lawsuit terminated in Gilbert's favor, which satisfied the second subsection of the standard.

13. The parties devote substantial argument to the issue of whether the trial court properly granted subsidiary fact-finding duties to the jury. The court made some statements regarding how it intended to allocate decision making between it and the jury if the case reached its conclusion. With respect to this question, the Restatement delineates the responsibilities of the court and the jury in a fairly complex manner, and the parties present differing interpretations. *See* Restatement (Second) of Torts § 681B. Because this case was decided on directed verdict, however, we need not address the proper allocation of decision-making duties at the conclusion of trial. A directed verdict is, by definition, granted by the court, and it is the court's decision as a matter of law that we review on appeal.

tor, verified that he had a security agreement, and established or preserved his status as a secured creditor.[14] Gilbert has asserted that the scope of her representation was limited primarily to representing Gunnoe in the Mountain View bankruptcy. Consequently, she maintains that her agreement to represent Gunnoe did not include any duty to perform the tasks that he alleges she failed to do.

¶ 23 Nevertheless, the factual dispute over the scope of Gilbert's representation is immaterial to the question of probable cause. Ince was not required to believe Gilbert instead of his client with respect to this particular factual dispute. Indeed, only in circumstances where it would be manifestly unreasonable for an attorney to believe his client's version of events could an attorney be justified in refusing to vigorously defend that viewpoint. Doing otherwise would be a breach of the fundamental duty of loyalty that attorneys owe to their clients.

¶ 24 Moreover, regardless of the parties' subjective perceptions about the scope of the attorney-client relationship, there were objective facts that reasonably could have been interpreted as evidence that Gilbert had failed to perform her duties as Gunnoe's attorney.[15] Gilbert received critical documents consummating a substantial exchange of property interests between Gunnoe and Brian Head. Gunnoe had retained Gilbert in connection with the property interest Gunnoe had received in the underlying agreement. Gilbert arranged for Gunnoe to formally relinquish (or, at the very least, facilitate his relinquishment of) his interest in the Woodbridge property without discovering that the security (i.e., the ski equipment) he expected to receive as part of the exchange was already subject to a prior lien. Gilbert filed a UCC–1 financing statement but did not verify whether any security agreement existed to be perfected by the statement. Given this information, Ince could have reasonably inferred that Gilbert had failed in her duties to her client. Regardless of the relative strength of the case, Ince thus possessed probable cause to initiate and pursue the malpractice suit against Gilbert.[16]

¶ 25 Gilbert likewise failed to negate probable cause on Gunnoe's allegation that she acted under a conflict of interest. Ince was aware of information that Gilbert had prior attorney-client relationships with Nichols and Brian Head and that her professional relationship with Nichols and Brian Head was potentially ongoing. Although Ince did not have specific information that Gilbert was formally acting as Nichols' attorney in the same transaction for which she undertook representation of Gunnoe, Ince did possess information from which a reasonable attorney could infer that Gilbert had acted to further Nichols' interests in a manner that violated her duty of loyalty to Gunnoe.[17] Specifically, Gilbert had requested that Gunnoe act quickly to fulfill his part of the bargain, but she took no further action on her recommendation that a written agreement be drafted when Nichols failed to respond to her request for information. Ince

14. There is some indication that Gunnoe may have later admitted that he had misunderstood certain aspects of the scope of Gilbert's representation, but no evidence was presented to show that he disbelieved the essential and fundamental representations he made to Ince at the time of the initial filing and subsequent revival of the malpractice suit.

15. This evidence may have been subject to successful rebuttal, but that possibility is immaterial to the question of probable cause. An attorney is not required to successfully predict the outcome of any evidentiary battle when preparing a complaint.

16. Of course, this is a different question than whether Gilbert *actually* failed to perform her duties. That question was resolved in Gilbert's favor when the trial court granted summary judgment on one claim and Gunnoe withdrew the other.

17. Gilbert asserts that there was no basis for Ince to claim conflict of interest unless he could show that Gilbert had represented adverse parties in the same transaction. *See* Utah R. Prof. Conduct 1.9(a). However, even if Ince had become convinced that Gilbert was *not* formally representing Nichols and Brian Head in connection with Gunnoe's and Nichols' negotiations, the inference that Gilbert had acted in deference to Nichols (a former client) in a manner that had disadvantaged Gunnoe (her current client) could give rise to an assertion of conflict of interest under rule 1.7(b) of the Rules of Professional Conduct.

testified that he interpreted this act as furthering Nichols' and Brian Head's interests while ignoring Gunnoe's interests. Although the information upon which Ince acted in alleging conflict of interest was somewhat tenuous, it cannot be said that the inference provided insufficient probable cause for the claim.

¶ 26 Gilbert nevertheless asserts that even if she failed in her duty, Gunnoe was not harmed and therefore had no basis to bring an action against her. Gilbert does not support this assumption. Lawsuits may result only in nominal damages, but that does not deprive a plaintiff of the right to adjudicate a defendant's breach of duty. *See, e.g.*, *Foote v. Clark*, 962 P.2d 52, 57–58 (Utah 1998).

¶ 27 Moreover, Gilbert has failed to raise credible evidence showing a lack of damages. Ince could have reasonably relied upon the facts Gunnoe supplied to him to conclude that Gilbert should have discovered the encumbered status of the ski equipment prior to facilitating the relinquishment of Gunnoe's interest in the Woodbridge property. Given that reasonable reliance, the next logical conclusion would be to assume that had Gunnoe been properly informed that Nichols and Brian Head had misrepresented the status of the ski equipment, Gunnoe would have had further options with respect to performing his part of the bargain. Though there was no testimony as to whether Nichols' misrepresentation would have vitiated the agreement or allowed Gunnoe to obtain substitute collateral, it was Gilbert's burden to demonstrate that Gunnoe could not have materially improved his position even if he possessed the critical information prior to signing the Woodbridge reconveyance. She did not meet her burden on that question.

¶ 28 Therefore, the trial court correctly concluded that Gilbert had not shown that Ince lacked probable cause on the two substantive claims raised in the underlying suit for malpractice. Because this showing was indispensable to maintaining the cause of action, we need not address the second prong, wherein Gilbert was required to demonstrate an improper purpose. We affirm the trial court's grant of a directed verdict to defendants Ince and the law firm of Callister, Nebeker & McCullough.

¶ 29    Chief Justice HOWE, Associate Chief Justice DURHAM, Justice STEWART, and Justice ZIMMERMAN concur in Justice RUSSON's opinion.

