1999 UT 90

**SALT LAKE CITY SOUTHERN RAILROAD COMPANY, INC., Petitioner,**

v.

**UTAH STATE TAX COMMISSION, Respondent.**

**Utah Association of Counties, Intervenor.**

No. 970529.

Supreme Court of Utah.

Sept. 14, 1999.

Robert A. Peterson, Milo Steven Marsden, Kevin Joseph Simon, Salt Lake City, for petitioner.

Jan Graham, Att'y Gen., Gale K. Francis, Michelle Bush, Asst. Att'ys Gen., Salt Lake City, for respondent.

Bill Thomas Peters, Salt Lake City, for intervenor.

RUSSON, Justice:

¶ 1 Petitioner Salt Lake City Southern Railroad Company seeks review of a ruling of the Utah State Tax Commission upholding the 1994 valuation of petitioner's taxable property. The Property Tax Division of the Tax Commission had determined that, as of January 1, 1994, the fair market value of petitioner's taxable property was $1 million. We affirm.

## BACKGROUND

¶ 2 Salt Lake City Southern Railroad Company (the "Company") is in the business of "spotting" railcars, which involves shuttling railcars to and from local customers of Union Pacific Railroad ("UPRR") for loading and unloading. By contract with UPRR, the Company receives a fee for each railcar spotted. The Company began performing its services in April of 1993 and realized a net operating income that year of $84,621.

¶ 3 The Company owns an old locomotive and various items of office furniture and office equipment. It also leases a second locomotive. The railcars it shuttles are owned by UPRR. Although the Company owns no real property, it has a "Permanent Freight Railroad Operating Easement" (the "Easement") that gives it the exclusive right to conduct freight railroad operations (spotting railcars) on the railroad tracks it uses. UPRR granted the Easement to the Company free of charge and can extinguish it upon payment to the Company of $5,000.

¶ 4 In a notice of assessment dated May 1, 1994, the Property Tax Division of the Tax Commission (the "Division") valued the Company's taxable operating property at $1 million.[1] In reaching this valuation, the Division relied on an appraisal of the Company's property prepared by Charles Peterson, a licensed appraiser. Peterson appraised the property using an "income approach" to valuation, which calculates property value by computing the present value of anticipated income from the property. Under this approach, Peterson appraised the Company's operating property at a value of $1,053,356, which the Division rounded to $1 million. Peterson employed this approach to capture the fair market value of the Company's collective property operating together in what is known as a "unitary appraisal." Peterson included the Easement as part of the Company's taxable property.

¶ 5 The Company appealed the Division's assessment to the State Tax Commission (the "Commission"). The Company contended that its Easement constituted intangible property that by state law is not subject to property tax. The Company argued, alternatively, that even if the Easement was taxable, its fair market value was only $5,000—the price UPRR would have to pay to extinguish it—and that the Division's assessment was therefore excessive. The Company did not present an alternative appraisal, contending instead that its own balance sheets represented an accurate value of its taxable prop-

erty. Those balance sheets assigned a combined value of approximately $7,000 to its property, exclusive of the Easement. Finally, the Company asserted that the Division's use of the income approach to valuation was improper.

¶ 6 After conducting a formal hearing on the matter, the Commission rejected the Company's challenges, concluding that the Company did not sustain its burden of establishing that the fair market value of its taxable property was other than the value assessed by the Division. The Commission noted that the Company's balance sheets, which indicated the purchase cost of its locomotive and office materials, did not account for the value of the Easement or its leased locomotive, nor did they reflect the value of the Company's property items operating together as a unit. The Commission concluded that the Easement constituted a legal right and interest in real property and, as such, was subject to taxation. The Commission also determined that the Division's use of the income approach of appraisal was proper and that the resulting valuation did not unlawfully include the value of intangible property. Pursuant to our decision in *Evans & Sutherland Computer Corp. v. State Tax Commission,* 953 P.2d 435, 443 (Utah 1997), the Company directly petitioned this court for review of the Commission's decision.

## STANDARD OF REVIEW

¶ 7 The relevant standard of review is specified by statute. We are to "grant the [C]ommission deference concerning its written findings of fact, applying a substantial evidence standard on review," and "no deference concerning its conclusions of law, applying a correction of error standard."[2] Utah Code Ann. § 59–1–610(1) (1996); *see also Zissi v. State Tax Comm'n,* 842 P.2d 848, 852 (Utah 1992) (noting that Commission's factual findings will be upheld if they "are supported by substantial evidence based upon the record as a whole"). " 'Substantial evi-

1. The Company is assessed as a public utility or railroad company in accordance with section 59–2–201(1)(b) of the Utah Code.

2. The standard of review concerning questions of law is qualified if "there is an explicit grant of discretion contained in a statute at issue." Utah Code Ann. § 59–1–610(1)(b) (1996). No such grant of discretion is involved in this case.

dence' is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank of Boston v. Board of Equalization,* 799 P.2d 1163, 1165 (Utah 1990).

## DISCUSSION

¶ 8 We first address the correctness of including the Company's Easement as part of its taxable property. The Utah Constitution mandates that all tangible property within the state be taxed. It provides, "All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed at a uniform and equal rate in proportion to its value, to be ascertained as provided by law." Utah Const. art. XIII, § 2(1). Consistent with this provision, section 59-2-103 of the Property Tax Act provides, "All tangible taxable property shall be assessed and taxed at a uniform and equal rate on the basis of its fair market value...." Utah Code Ann. § 59-2-103 (1996). "Intangible property," on the other hand, is exempt from taxation. *See id.* § 59-2-1101(2)(g). The issue before us, then, is whether the Easement is considered tangible or intangible property for property tax purposes.

■ ¶ 9 The Property Tax Act does not define tangible as opposed to intangible property. The Act, however, does provide a representative list of items of intangible property. It states that "property" is "property which is subject to assessment and taxation according to its value, but does not include moneys, credits, bonds, stocks, representative property, franchises, goodwill, copyrights, patents, or other intangibles." *Id.* § 59-2-102(19). The "intangibles" identified by this provision accord with generally accepted definitions of intangible property. *Black's Law Dictionary,* for instance, defines "intangible property" as follows: "As used chiefly in the law of taxation, this term

means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises." *Black's Law Dictionary* 809 (6th ed.1990). By contrast, "tangible property" is defined as "[p]roperty that has physical form and substance...." *Id.* at 1456. From these definitions, it is reasonable to conclude that tangible property, for tax purposes, has a physical aspect and has value in and of itself.

■ ¶ 10 This court has not addressed whether easements constitute tangible property for property tax purposes. In general, an easement "is a right to use another's land for special purposes.... [It] is a right in land rather than a mere privilege.... An easement is property." George W. Thompson, 2 *Real Property* § 315 (1980). An easement holder has the right to use the designated land for specific purposes and exclude others therefrom who would interfere with those purposes. *See* Roger A. Cunningham et al., *The Law of Property* § 8.1, at 437 (2d ed.1993). Although "all interests in land are non-physical concepts, ... the uses that may be exercised by [an easement holder] are as physical as the possession that goes with an estate; they are simply different kinds of physical acts." *Id.* On previous occasions, this court has characterized easements as "interest[s] in land" for purposes of the takings clause of the Utah Constitution,[3] *see Colman v. State Land Bd.,* 795 P.2d 622, 625 (Utah 1990), and for purposes of the Utah Statute of Frauds.[4] *See Wells v. Marcus,* 25 Utah 2d 242, 480 P.2d 129, 130 n. 1 (1971); *see also Crane v. Crane,* 683 P.2d 1062, 1066 (Utah 1984) (describing easement as personal interest in real estate).

■ ¶ 11 The Company's Easement gave it "the exclusive right to conduct freight railroad operations" on the specified railroad tracks "for the purpose of providing common carrier rail freight service to all freight cus-

---

3. The takings clause provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." Utah Const. art. I, § 22.

4. The Statute of Frauds provides that "[n]o estate or interest in real property ... shall be created, granted, assigned, surrendered or declared otherwise than by act or operation of law, or by deed or conveyance in writing." Utah Code Ann. § 25-5-1 (1998).

tomers." The Easement "include[d]· the right to operate [the Company's] trains, locomotives, railcars and rail equipment with [the Company's] own crews." The Easement also included a right of entry "for any and all [of the Company's] employees, agents or representatives, machinery, vehicles or equipment."

¶ 12 The Commission did not err in concluding that the Easement was tangible property subject to taxation. The Easement constituted an interest in the designated land and railroad tracks. It gave the Company the exclusive right to make use of the land and trackage for freight railroad operations. Although the Easement, in the abstract, was nonphysical, it gave the Company the right to use and occupy the physical property involved. Moreover, the Company's various rights under the Easement had intrinsic value. Without them, the Company could not have carried on its business of shuttling railcars to and from UPRR's local customers. The Easement enabled the Company's other assets, including its locomotives, office equipment, manpower, and contract with UPRR, to be put to productive use. In short, the Easement was properly considered part of the Company's taxable property.[5]

¶ 13 We next address whether the Commission properly rejected the Company's challenges to the method used in assessing its property and the resulting valuation of $1 million. The choice of valuation methodology in assessing property is a question of fact. *See, e.g., Schmidt v. State Tax Comm'n,* 980 P.2d 690, ¶ 6 (Utah 1999); *Beaver County v. State Tax Comm'n,* 916 P.2d 344, 355 (Utah 1996). The resulting determination of fair market value is also a question of fact. *See, e.g., Alta Pacific v. State Tax Comm'n,* 931 P.2d 103, 109 (Utah 1997); *First Nat'l Bank of Boston,* 799 P.2d at 1165. The petitioner, in this case the Company, bears the burden of demonstrating that the Commission's factual findings are erroneous. *See* Utah Code Ann. § 59–1–604 (1996); *see also Beaver*

*County,* 916 P.2d at 355. To prevail, the Company "must marshal all of the evidence supporting the findings [of fact] and show that despite the supporting facts and in light of the conflicting evidence, the findings are not supported by substantial evidence." *Beaver County,* 916 P.2d at 355–56. The Company is obligated "not only to show substantial error or impropriety in the assessment, but also to provide a sound evidentiary basis upon which the Commission could adopt a lower valuation." *Utah Power & Light Co. v. State Tax Comm'n,* 590 P.2d 332, 335 (Utah 1979).

¶ 14 The Company contends that instead of using the income approach to valuation, the Division should have added together the separate values of its property items as reflected by its own balance sheets. This court has endorsed the following approaches in assessing fair market value: cost, income, and market. *See Schmidt,* 980 P.2d at ¶ 6; *Beaver County,* 916 P.2d at 347. The cost approach determines property value based on original cost less depreciation; the income approach determines property value by computing the present value of anticipated income generated by the property; and the market approach examines the prices at which comparable properties have been bought and sold. *See Schmidt,* 980 P.2d at ¶ 9; *Beaver County,* 916 P.2d at 347.

¶ 15 Substantial evidence supports the Division's choice of valuation methodology. Charles Peterson, the licensed appraiser who appraised the Company's property, testified that the income approach he utilized was the most reliable indicator of value. Peterson also appraised the Company's property under the market approach,[6] but testified that the market approach was less reliable in this instance. Peterson testified that he did not appraise the property under a cost approach because that approach would not have accounted for the value of the Company's Easement, which was obtained free of

---

5. We do not address whether other easements in different business contexts are also subject to property tax. *See Black's Law Dictionary* 509–10 (6th ed.1990) (defining various kinds of easements).

6. The market approach resulted in a valuation of the Company's property of $738,000.

charge. The Company submitted no competent evidence countering Peterson's testimony or otherwise discrediting the Division's reliance on the income approach in this case. The Company's unsupported assertion that a different methodology should have been used does not constitute a basis for reversal. The Commission properly upheld the Division's choice of valuation methodology.

¶ 16 The Company also contends that the $1 million valuation of its property was excessive. The Company reasons that since the book value of its property other than the Easement was approximately $7,000, the Division by inference assigned the Easement a value of $993,000. The Company maintains that the actual fair market value of the Easement was only $5,000—the amount UPRR would have to pay to cancel it.

¶ 17 The Company has failed to meet its burden in challenging the valuation of its property. First, the Company has not demonstrated that the $1 million assessment is not supported by substantial evidence. As noted, in assessing the Company's property, the Division relied on Peterson's appraisal. Peterson annualized the 1993 earnings generated from the Company's property and applied to that figure a capitalization rate of 10.71 percent. Peterson arrived at that rate by comparing capitalization rates for all railroad companies in 1994 and then adjusting the average rate to compensate for the Company's relative lack of diversity. Using this approach, Peterson appraised the Company's operating property at $1,053,356. The Company has not established any flaw in Peterson's appraisal.

¶ 18 The Division also based its assessment on evidence that in 1993, UPRR's right-of-way over the railroad tracks at issue was listed on the tax rolls of local taxing districts at an assessed value of over $3.45 million. From that right-of-way, UPRR granted the Easement to the Company. The right-of-way covered the same rail trackage that the Company's Easement encompasses. Although the economic prospects of UPRR's intended use of its right-of-way certainly differed from those of the Company's intended

use of the Easement, Peterson's appraisal accounted for that difference by calculating the present value of anticipated income from the Easement. Thus, Peterson's appraisal, coupled with the previously assessed value of the right-of-way on which the Easement was granted, supported the Division's valuation of the Company's taxable property.

¶ 19 In addition, the Company has not presented a sound evidentiary basis for adopting a lower valuation. The Company submitted no alternative appraisal of its property, but relied solely on its own balance sheets to support its proposed valuation. Those records merely state the historical acquisition cost of the Company's locomotive and office equipment. They do not indicate the value of the Easement or of the Company's collective property operating as a whole. The Company's balance sheets, by themselves, are an insufficient basis for adopting a lower valuation of the Company's property.

¶ 20 Furthermore, the stipulated amount that UPRR would have to pay the Company to cancel the Easement does not establish the Easement's fair market value. UPRR founded the Company to fulfill its obligations to local customers. To enable the Company to shuttle railcars to and from those local customers, UPRR granted it the Easement. UPRR charged nothing for the Easement and reserved the right to cancel it upon payment of $5,000. This arrangement is not a reliable indicator of the Easement's fair market value. *See* Utah Code Ann. § 59–2–102(8) (1996) (defining fair market value); *see also Waste Management of Wis., Inc. v. Board of Rev.,* 184 Wis.2d 541, 516 N.W.2d 695, 701 (1994) (defining fair market value as amount willing buyer will pay in arm's-length transaction).

¶ 21 Moreover, under the Division's assessment methodology, there was no need to value the Easement independently from the Company's other property. In using the income approach of assessment, the Division attempted to capture the fair market value of the Company's property operating together as a single unit. Such "unitary appraisals" value the synergistic nature of a business's collective property. In *ITT World*

**600**

*Communications, Inc. v. San Francisco,* 37 Cal.3d 859, 210 Cal.Rptr. 226, 693 P.2d 811 (1985), the court described the rationale of unitary appraisals thusly:

> One of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property. It has long been recognized that "public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole."

*Id.* 210 Cal.Rptr. 226, 693 P.2d at 815 (citation omitted) (quoting Louis G. Bertane, *The Assessment of Public Utility Property in California,* 20 UCLA L.Rev. 419, 433 (1973)); *see also Adams Express Co. v. Ohio State Auditor,* 166 U.S. 185, 221–22, 17 S.Ct. 604, 41 L.Ed. 965 (1897) (upholding Ohio's unitary assessment of freight company); *Washburn v. Washburn Waterworks Co.,* 120 Wis. 575, 98 N.W. 539, 542 (1904) (explaining that unitary appraisals are utilized because "[t]he separate value of the parts in the aggregate would not necessarily approximate ... any legitimate measure of the value of all the parts, viewed as one complete machine."). The Company has established no error in the unitary appraisal of its property.

¶ 22 In sum, the Commission properly upheld the Division's assessment of the Company's taxable property. The Company did not establish that the assessment included the value of any intangible property, nor did it demonstrate that the choice of assessment methodology and resulting valuation were not supported by substantial evidence.

### CONCLUSION

¶ 23 On the basis of the foregoing, we affirm the Commission's decision upholding the Division's 1994 assessment of the Company's taxable property.

¶ 24 Chief Justice HOWE, Associate Chief Justice DURHAM, and Justice ZIMMERMAN concur in Justice RUSSON's opinion.

¶ 25 Justice STEWART concurs in the result.

