2002 UT 112

**ATLAS STEEL, INC., Petitioner,**

v.

**UTAH STATE TAX COMMISSION, Respondent.**

No. 20010483.

Supreme Court of Utah.

Nov. 19, 2002.

Roger O. Tew, David E. Sloan, Salt Lake City, for petitioner.

Mark L. Shurtleff, Att'y Gen., Gale K. Francis, Asst. Att'y Gen., Salt Lake City, for respondent.

RUSSON, Justice:

¶ 1 Atlas Steel, Inc. ("Atlas"), seeks review of a Utah State Tax Commission ("Commission") ruling that its purchase of certain equipment was subject to sales and use tax. We affirm.

## BACKGROUND

¶ 2 Sometime between June 30, 1991, and December 31, 1996, Atlas purchased certain equipment and parts. Specifically, Atlas purchased (1) a "Newell 98104 Super Heavy Duty Dry/Dry Shredding System," (2) a capped disc rotor for use in the new shredder, (3) a hard-faced capped rotor, also for use in the new shredder, and (4) a Mitsubishi hydraulic excavator, which replaced four cable cranes (collectively, "equipment"). The shredder is designed to accept raw materials as large as whole cars. After the raw materials have been shredded, they are transferred by conveyors to a closed air loop separation unit that sorts the materials into various types.

¶ 3 The shredder cost approximately $3,000,000. Installation of the shredder system was a lengthy process, requiring approximately 6,000 hours of labor and the use of a 25-ton hydraulic crane for at least six weeks. The installation cost approximately $1,000,000. Atlas did not pay sales tax on the purchase of the equipment.

## PROCEDURAL HISTORY

¶ 4 The Auditing Division of the Commission ("Auditing Division") conducted an audit of Atlas for the period of June 30, 1991, through December 31, 1996 ("audit period"). On March 23, 1995, the Auditing Division issued a statutory notice declaring that Atlas owed sales tax and interest in the amount of $57,470.91 for the purchase of equipment during the audit period. In response, Atlas filed a petition for redetermination with the Commission. A formal hearing was held before the Commission on November 8 and 9, 1999. On September 12, 2000, the Commission issued its findings of fact, conclusions of law, and final decision upholding the Auditing Division's sales tax assessment. Atlas subsequently filed a petition for reconsideration and clarification with the Commission on September 29, 2000, which was denied by the Commission on May 15, 2001. Atlas timely sought a writ of review from this court on June 8, 2001.

¶ 5 In the proceedings before the Commission, Atlas maintained that its purchase of equipment qualified for the sales tax exemption ("manufacturing equipment sales tax exemption") found in Utah Code Ann. § 59–12–104(15) (1992).[1] Subsection 59–12–104(15)

exempts sales of machinery and equipment purchased by a manufacturer for use in new or expanding operations in any manufacturing facility in Utah. "Manufacturing facility" is defined as "an establishment described in SIC Codes 2000 to 3999 of the 1987 Standard Industrial Classification Manual, of the federal Executive Office of the President, Office of Management and Budget." *Id.* § 59–12–104(15).

¶ 6 Atlas argued before the Commission that Atlas met the definition of a manufacturing facility because it is an establishment that is described in SIC Code 3313 "Electrometallurgical Products, Except Steel,"[2] or alternatively, SIC Code 3399 "Primary Metal Products, Not Elsewhere Classified,"[3] and therefore its purchase of the equipment qualified for the manufacturing equipment sales tax exemption.

¶ 7 The Commission rejected Atlas' arguments that Atlas was described specifically in either SIC Code 3313 or SIC Code 3399. In rejecting Atlas' position that Atlas was described in SIC Code 3313, the Commission found that Atlas "[did] not use either an electrometallurgical or metallothermic process" and therefore concluded that Atlas was not "an establishment described in SIC Code 3313." In addition, in rejecting Atlas' arguments regarding SIC Code 3399, the Commission interpreted SIC Code 3399 to require that the types of products listed in that code and the types of products manufactured by an establishment be similar in order for that establishment to be described in that particular code. The Commission concluded that none of Atlas' products were similar to

1. For the majority of the audit period, the 1992 version of the manufacturing equipment sales tax exemption was in effect. In 1995, the legislature amended this sales tax exemption provision. The amended version became effective July 1, 1995. The relevant portions of the 1995 version are virtually the same as those in the 1992 version. *Compare* Utah Code Ann. § 59–12–104(15) (1992), *with* Utah Code Ann. § 59–12–104(15)(a)(i)(A)–(B) (1995). References in this opinion will be to the 1992 version of the statute, which was in effect for a majority of the audit period.

2. SIC Code 3313 in relevant part reads: "Establishments primarily engaged in manufacturing

ferro and nonferrous metal additive alloys by electrometallurgical or metallothermic processes, including high percentage ferroalloys and high percentage nonferrous additive alloys." Executive Office of the President, Office of Management and Budget, *Standard Industrial Classification Manual*, Industry Group No. 331, Industry No. 3313, at 174 (1987) [hereinafter *SIC Manual*].

3. SIC Code 3399 reads: "Establishments primarily engaged in manufacturing primary metal products, not elsewhere classified, such as nonferrous nails, brads, and spikes, and metal powder, flakes, and paste." *SIC Manual*, Industry Group No. 339, Industry No. 3399, at 181.

those listed in SIC Code 3399 and therefore SIC Code 3399 did not describe Atlas.

¶ 8 After rejecting Atlas' arguments that Atlas was described in SIC Codes 3313 and 3399, the Commission also concluded that "the SIC code that best describes [Atlas] is code 5093, Scrap and Waste Materials," [4] and therefore that Atlas was not eligible for the manufacturing equipment sales tax exemption. In other words, because the Commission determined that Atlas was best described in SIC Code 5093, the Commission concluded that Atlas was not "described in SIC Codes 2000 to 3999 of the 1987 Standard Industrial Classification Manual." *Id.* § 59–12–104(15).

¶ 9 In determining that Atlas was best described in SIC Code 5093. and in reaching its conclusion that Atlas was not a manufacturing facility under the statute, that is, was not described in SIC Codes 2000 to 3999 by virtue of its description under SIC Code 5093, the Commission interpreted section 59–12–104(15) as incorporating by reference the "body" of the 1987 Standard Industrial Classification Manual ("SIC Manual") and its classification scheme, including the SIC Manual's introductory, explanatory, and commentary sections. The Commission took the position that it was compelled to interpret the statute's requirement that an establishment be "described in SIC Codes 2000 to 3999," consistent with the function, use, and interpretation of the SIC Manual and its classification scheme as a whole.

¶ 10 Thus, the Commission explained its interpretation of the statute as follows:

By incorporating the Standard Industrial Classification ("SIC") system into the manufacturing exemption, the legislature established a "bright-line" test, based on an extensive preexisting classification system, rather than relying on broad definitions. That system recognized that certain "establishments" could conceivably conduct more than one type of activity or could be described by more than one code. It nevertheless rejected the option of using mul-

tiple codes, providing instead that "[e]ach operating establishment is assigned an industry code on the basis of its primary activity, which is determined by its principal product or group of products produced or distributed, or services rendered." SIC Manual, p. 15; *see also* p. 11. The SIC Code also recognizes that "some manufacturing-type activities" may be performed by other kinds of establishments. (SIC Manual, p. 68). *Thus, we believe our obligation is to determine which SIC code most accurately describes the establishment in question. If the code that best describes the establishment is contained in SIC Codes 2000 to 3999 of the 1987 Manual, the establishment qualifies. If the code that best describes the establishment is outside that range, the establishment does not qualify.*

(Emphasis added.)

¶ 11 Employing this interpretation, the Commission finally concluded that "the SIC code that best describes [Atlas] is [SIC C]ode 5093, Scrap and Waste Materials."

¶ 12 In view of the foregoing reasons, the Commission ultimately determined that Atlas "did not meet the statutory requirements of a manufacturing facility during the audit period, and the purchases made by [Atlas] during the audit period were subject to sales and use tax." (Footnote omitted.)

¶ 13 Atlas argues that the Commission erred as a matter of law by misconstruing the sales tax exemption statute. Atlas contends that the Commission went beyond the plain language of the statute by impermissibly adopting an unauthorized and more stringent "best described in" standard that incorporated the SIC Manual and classification system as a whole into the statute, instead of applying the "described in" legal standard explicitly set forth in the statute. Atlas maintains that under the statutorily mandated "described in" standard it qualifies as a "manufacturing facility"—and thus for the manufacturing equipment sales tax exemption—under either SIC Code 3313 or SIC

---

**4.** *SIC Code 5093 reads: "Establishments primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials. This industry includes auto wreckers* engaged in dismantling automobiles for scrap." *SIC Manual,* Industry Group No. 509, Industry No. 5093, at 301.

Code 3399 and that there is substantial evidence in the record to support the conclusion that it is described in either of those two SIC codes. In addition, Atlas contends that the Commission erred as a matter of law by interpreting SIC Code 3399 to require similarity of products between those listed in SIC Code 3399 and those produced by an establishment in order for an establishment properly to be described by that SIC code. Finally, Atlas argues that the Commission's findings of fact that Atlas does not use an electrometallurgical process as required by SIC Code 3313 and that Atlas is best described in SIC Code 5093 are erroneous because they are not supported by substantial evidence.

## STANDARD OF REVIEW

¶ 14 Our standard of review for this case is specified by statute. *See* Utah Code Ann. § 59–1–610 (2000). When reviewing formal adjudicative proceedings of the Commission, we "grant the commission deference concerning its written findings of fact, applying a substantial evidence standard," *id.* § 59–1–610(1)(a), but we "grant the commission no deference concerning its conclusions of law, applying a correction of error standard, unless there is an explicit grant of discretion contained in a statute at issue before [us]," [5] *id.* § 59–1–610(1)(b). *See also Salt Lake City S. R.R. Co. v. State Tax Comm'n*, 1999 UT 90, ¶ 7, 987 P.2d 594; *S. Cent. Utah Tel. Ass'n, Inc. v. Auditing Div. of State Tax Comm'n*, 951 P.2d 218, 222 (Utah 1997).

¶ 15 Inasmuch as the Commission interpreted section 59–12–104(15) of the Utah Code and the specific language of SIC Codes 2000 to 3999 in concluding that Atlas' purchase of equipment did not qualify for the manufacturing equipment sales tax exemption, its determination is a matter of statutory interpretation and a conclusion of law that we grant no deference and review for correctness. *See Salt Lake Brewing Co. v. Auditing Div. of State Tax Comm'n*, 945 P.2d 691, 693 (Utah 1997); *Cache County v. Prop. Tax Div. of State Tax Comm'n*, 922 P.2d 758, 767 (Utah 1996); Utah Code Ann. § 59–1–610(1)(b).

■ ¶ 16 For purposes of reviewing the Commission's findings of fact under the substantial evidence standard, Utah Code Ann. § 59–1–610(1)(a), substantial evidence " 'is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion.' " *Salt Lake City S. R.R. Co.*, 1999 UT 90 at ¶ 7, 987 P.2d 594 (quoting *First Nat'l Bank of Boston v. County Bd. of Equalization of Salt Lake County*, 799 P.2d 1163, 1165 (Utah 1990)).

## ANALYSIS

### I. INTERPRETATION OF SALES TAX EXEMPTION STATUTE

¶ 17 Atlas first argues that the Commission erred as a matter of law in interpreting section 59–12–104(15) of the Utah Code by concluding that Atlas was not a "manufacturing facility" as defined by the statute because Atlas was not "best described in" SIC Codes 2000 to 3999 but instead was best described in SIC Code 5093. Atlas contends that the Commission impermissibly heightened the standard set forth in the statute to one re-

---

**5.** The Commission argues that its interpretation of the sales tax exemption is entitled to deference because the statute grants it the discretion and authority to define "establishment." *See* Utah Code Ann. § 59–12–104(15) ("For purposes of this subsection, the commission shall by rule define 'new or expanding operations' and 'establishment.' "). The Commission contends that because the definition of "manufacturing facility" in the statute "equates 'manufacturing facility' and 'establishment' " the Commission also has an explicit grant of discretion to interpret the meaning of the term "manufacturing facility."

The statute does not contain an explicit grant of discretion to the Commission to define manufacturing facility. The statute itself defines man-

ufacturing facility. If the legislature had intended to grant the Commission discretion to define and interpret the term "manufacturing facility," it would have granted the Commission that discretion explicitly in the statute as it did for the term "establishment" and the phrase "new or expanding operations." In any event, the Commission's argument essentially posits that the statute's use of the term "establishment" in the definition of manufacturing facility *implicitly* grants the Commission discretion. That, of course, is not an explicit grant of discretion, and we therefore do not grant its interpretation of manufacturing facility deference. *See* Utah Code Ann. § 59–1–610.

quiring an establishment to be "best described in" SIC Codes 2000 to 3999 from one merely requiring an establishment to be "described in" the enumerated SIC code range in order to be a manufacturing facility qualifying for the manufacturing equipment sales tax exemption.

¶ 18 The Commission counters that the legislature, in referencing SIC Codes 2000 to 3999 in the definition of a "manufacturing facility," incorporated by reference into the Utah Code the entire SIC Manual, including its introductory, explanatory, and commentary sections, rather than merely the discrete language of the SIC codes specifically listed in the statute. Based upon its assumption that the legislature incorporated the entire SIC Manual and classification system, the Commission maintains that its "obligation is to determine which SIC code most accurately describes the establishment in question." In other words, "[i]f the code that *best describes* the establishment is contained in SIC Codes 2000 to 3999 of the 1987 Manual, the establishment qualifies [but] if the code that *best describes* the establishment is outside of that range, the establishment does not qualify." (Emphasis added.)

 ¶ 19 " 'When interpreting statutes, we determine the statute's meaning by first looking to the statute's plain language, and give effect to the plain language unless the language is ambiguous.' " *Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶ 14, 54 P.3d 1177 (quoting *Blackner v. State Dep't of Transp.*, 2002 UT 44, ¶ 12, 48 P.3d 949); *see also State Dep't of Natural Res. Div. of Wildlife Res. v. Huntington–Cleveland Irrigation Co.*, 2002 UT 75, ¶ 13, 52 P.3d 1257. Furthermore, "[i]n construing a statute, [we] must assume that 'each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable.' " *County Bd. of Equalization of Wasatch County v. State Tax Comm'n*, 944 P.2d 370, 373 (Utah 1997) (quoting *Savage Indus., Inc. v. State Tax Comm'n*, 811 P.2d 664, 670 (Utah 1991)) (further quotation omitted).

¶ 20 Section 59–12–104 of the Utah Code exempts certain sales and uses from taxes imposed by chapter 12 of title 59. Specifically, subsection 59–12–104(15) exempts from sales tax

sales ... of machinery and equipment purchased ... by a manufacturer for use in new or expanding operations ... in any manufacturing facility in Utah.

Utah Code Ann. § 59–12–104(15).

¶ 21 The statute goes on to define "manufacturing facility" as "an establishment described in SIC Codes 2000 to 3999 of the 1987 Standard Industrial Classification Manual, of the federal Executive Office of the President, Office of Management and Budget." *Id.* Thus, the definition of manufacturing facility incorporates by reference the language of SIC Codes 2000 to 3999 as it is used in the SIC Manual and classification system.

¶ 22 Each of the SIC codes specifically referenced in the manufacturing equipment sales tax exemption, SIC Codes 2000 to 3999—and even in the rest of the SIC codes in the SIC Manual as a whole—employs the phrase "primarily engaged in" to describe establishments. In other words, the plain language of the standard industrial classification system and its attendant codes describes establishments in reference to the activity in which the establishment is primarily engaged. For example, SIC Codes 2000 to 3999 describe establishments "primarily engaged in manufacturing" particular products through certain processes. Other SIC codes describe establishments "primarily engaged in" other activities. *Compare, e.g., SIC Manual,* Industry Group No. 331, Industry No. 3313 ("primarily engaged in manufacturing"), *with SIC Manual,* Industry Group No. 509, Industry No. 5093 ("primarily engaged in assembling, breaking up, sorting or wholesale distribution").

¶ 23 The plain language of the SIC codes, by using the phrase "primarily engaged in," indicates that only one SIC code can be used to describe an establishment.[6] Even though an establishment may be engaged in several different activities, it can be *primarily* engaged in only one such activity, with any

**6.** *Webster's Third New International Dictionary* 1800 (1961) defines "primarily" as "first of all: fundamentally, principally" and "in the first place."

other activities being secondary or ancillary. This is true not only for SIC Codes 2000 to 3999 but for all of the codes in the SIC Manual and the standard industrial classification scheme as a whole. This interpretation of the SIC codes is compelled by the plain "primarily engaged in" language used in the codes themselves.[7]

¶ 24 Therefore, when the plain language of the statute is read in connection with the plain language of the incorporated SIC codes, the key in determining whether an establishment is described in a particular SIC code is whether that establishment is "primarily engaged in" the activity set forth in that SIC code. In order to be described by SIC Codes 2000 to 3999, the establishment must be "primarily engaged in manufacturing" the types of products referenced in the manner or under the conditions specified.

¶ 25 According to this statutory scheme, in the case of SIC Code 3313 for example, an establishment, such as Atlas, is described in SIC Code 3313 if it is "primarily engaged in manufacturing ferro and nonferrous metal additive alloys by electrometallurgical or metallothermic processes, including high percentage ferroalloys and high percentage nonferrous additive alloys." *SIC Manual,* Industry Group No. 331, Industry No. 3313, at 174. Similarly, with respect to SIC Code 3399, an establishment, such as Atlas, is described in SIC Code 3399 if it is "primarily engaged in manufacturing primary metal products, not elsewhere classified, such as nonferrous nails, brads, and spikes, and metal powder, flakes, and paste." *SIC Manual,* Industry Group No. 339, Industry No. 3399, at 181.

█ ¶ 26 In determining if an establishment is described in SIC Codes 2000 to 3999, the Commission must make factual determinations as to the activities in which the estab-

lishment is engaged, the extent to which an establishment is engaged in those activities, what processes are used in those activities, and what products result from those activities. From those factual determinations, the Commission must then make a legal conclusion as to whether the products created and processes utilized conform to those specified in SIC Codes 2000 to 3999 and whether the establishment is "primarily engaged in manufacturing" those specific products through those specific means.

¶ 27 In the instant case, the Commission interpreted the statute to require it to determine which SIC code out of the entire set of SIC codes best described Atlas. It did not need to do so. The Commission is not required to determine which of the SIC codes "best describes" Atlas.[8] The Commission is merely required to determine if one of the SIC codes in the range from 2000 to 3999 describes Atlas in the manner explained above.

¶ 28 In this case, the Commission, despite using the "best described in" language, did not err in its application of the statute. The Commission conducted a formal hearing at which it accepted evidence and established a factual record regarding Atlas' activities, processes, and products. On the basis of the evidence received at the formal hearing, the Commission made findings of fact and conclusions of law.

¶ 29 Specifically, from the evidence received at the hearing, the Commission found:

> 5. [Atlas] cuts and chops automobiles and other scrap metals and materials into smaller more usable pieces for recycling. Those smaller pieces are sorted into different types of materials with unusable parts being discarded. The pieces of ferrous metals are used by steel mills and other steel manufacturers.

---

7. As indicated in the Commission's explanation of its interpretation of the SIC codes in the statute, *see supra* ¶ 10, the SIC Manual's exposition on the function and use of the standard industrial classification system as a whole in the introductory and explanatory sections of the SIC Manual are consistent with this plain language interpretation of the language of the SIC codes.

8. Even though an analysis of which SIC code best describes an establishment is not legally required by the statutory language, to the extent that the Commission follows the analysis above and determines the activity in which an establishment is "primarily engaged" consistent with the process and product specifications of a particular SIC code, that code can be fairly said to "best" describe the establishment.

. . . .

8. [Atlas] uses a complex and technologically sophisticated process of shredding, crushing, pulverizing, and sorting to result in ferrous metal which meets its purchasers' requirements. In addition to resulting in ferrous metals, [Atlas] also supplies nonferrous metals to producers for conversion to usable metals.

. . . .

10. After the materials have been shredded, they are transferred by conveyors to a closed air loop separation unit which separates the materials into various types. The shredded materials are then transferred by a vibrating magnet feeder to an electromagnetic separation system consisting of two magnetic drums. The first magnetic drum lifts out ferrous materials from the shredded product and discharges them onto a steel pan vibrating conveyor which transfers the materials to a second magnetic drum. Together, the two magnetic drums lift out the ferrous materials and carry them to a ferrous picking conveyor.

11. The ferrous picking conveyor allows the operator to select special grades of ferrous materials. Finally, the ferrous product is transferred by a ferrous stacking conveyor to a stock pile or to transport. This ferrous metal product is then sold to steel companies to be used in the production of steel. During this process, the non-ferrous materials are transferred to a nonferrous closed air loop separator. After waste materials have been removed, the nonferrous materials are also transferred by conveyor to stock piles. This nonferrous metal product is also sold.

■ ¶ 30 In view of these detailed findings regarding Atlas' process and product, the Commission concluded that "the SIC code that best describes [Atlas] is code 5093, Scrap and Waste Materials." In making this legal conclusion, the Commission implicitly concluded that Atlas was "primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials." *SIC Manual*, Industry Group No. 509, Industry No. 5093, at 301. Given our previous interpretation of the plain lan-

guage of the statute and the SIC codes, the logical implication of the Commission's conclusion that Atlas was primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials and therefore was described in SIC Code 5093 is that Atlas was not described in SIC Codes 2000 to 3999. As a result, the Commission's conclusion that Atlas was not a manufacturing facility for purposes of the manufacturing equipment sales tax exemption was correct. Despite the Commission's unnecessary reference to the SIC code that "best describes" an establishment, the fact finding process and basic legal analysis performed by the Commission were consistent with the plain language of the statute and the incorporated SIC codes and were therefore correct.

¶ 31 Atlas also contends that the Commission erred in its interpretation of SIC Code 3399 by requiring that there be similarity between the products listed in SIC Code 3399 and the products produced by an establishment in order for the establishment to be described in that SIC code. We disagree.

¶ 32 SIC Code 3399 "Primary Metal Products, Not Elsewhere Classified" describes: "Establishments primarily engaged in manufacturing primary metal products, not elsewhere classified, *such as* nonferrous nails, brads, and spikes, and metal powder, flakes, and paste." *SIC Manual*, Industry Group No. 339, Industry No. 3399, at 181 (emphasis added). The Commission concluded that "there is nothing on the list [included in SIC Code 3399] which is similar to the products of [Atlas]." The Commission maintains that SIC Code 3399 requires similarity to the listed products to qualify for classification under this SIC code.

¶ 33 As discussed above, the language of the identified SIC codes has been incorporated by reference into the statute. We therefore interpret the language of the SIC codes as we would any other statutory language, applying the traditional rules of statutory construction. We interpret statutes according to their plain language. *See supra* ¶ 19.

■ ¶ 34 The language of SIC Code 3399 is clear and unambiguous. *Black's Law Dic-*

*tionary* 1432 (6th ed.1990) defines "such" as "[o]f that kind, having particular quality or character specified. Identical with, being the same as what has been mentioned. Alike, similar, of the kind." *See also In re Schlanger,* 206 Misc. 62, 132 N.Y.S.2d 66, 67 (N.Y.Sur.Ct.1954) ("The phrase, 'such as' is one of general similitude and generally defined as indicating matters 'of the same or like kind....' "); *Erwin v. Steele,* 228 S.W.2d 882, 885 (Tex.App.1950) ("[T]he phrase 'such as' is as a similitude, classifying articles of the kinds named, which are like or similar to those used...."). The language and list of products in SIC Code 3399 is not exhaustive; however, by employing the phrase "such as" prior to a specific list of products, SIC Code 3399 does require similarity to those listed products. Therefore, in order for a manufacturer to be described in SIC Code 3399, an establishment·must manufacture products similar to those identified. The Commission did not misinterpret the language of SIC Code 3399 by concluding that Atlas' products must be similar to those listed in order for Atlas to be described in SIC Code 3399.

¶ 35 The question of whether the products produced by Atlas are similar to those listed in SIC Code 3399 is a question of law. However, the predicate questions of what· products are actually produced by Atlas and what are those products' characteristics and qualities are questions of fact.

¶ 36 In its findings of fact, the Commission found that Atlas "cuts and chops automobiles and other scrap metals and materials into smaller more usable pieces for recycling," that "[t]hose smaller pieces are sorted into different types of materials with the unusable parts being discarded," and that "[t]he pieces of ferrous metals are used by steel mills and other steel manufacturers." Given these findings of fact regarding Atlas' products, the Commission did not err in concluding that "there is nothing on the list [in SIC Code 3399] which is similar to [Atlas'] products." The lack of similarity in products precludes the conclusion that Atlas is described in SIC Code 3399. Therefore, the Commission did not err in its interpretation of SIC Code 3399 or in its legal conclusion that Atlas is not described in that particular SIC code.

## II. FINDINGS OF FACT

¶ 37 Atlas challenges the sufficiency of the evidence to support the Commission's finding that Atlas does not use an electrometallurgical process in its production activities and the sufficiency of the evidence to support the Commission's conclusion that Atlas is best described in SIC Code 5093.

¶ 38 In its opening memorandum of law, Atlas focuses its sufficiency of the evidence challenge solely on the Commission's finding that Atlas does not use an electrometallurgical process. Atlas argues, "The Commission's finding that· Atlas does not use an electrometallurgical process is not based on any evidence in the record, let alone substantial evidence."

¶ 39 Given our previous interpretation of the sales tax exemption statute and our holding that the Commission did not err in its application of the statute when it concluded that Atlas is described in SIC Code 5093 and that by virtue of Atlas being described in that code it cannot be described in SIC Codes 2000 to 3999, Atlas' challenge to the Commission's finding that it does not use an electrometallurgical process is not relevant. Because we affirm the Commission's legal conclusion that Atlas is described in SIC Code 5093 and because Atlas does not challenge the sufficiency of the evidence to support the Commission's findings of fact regarding Atlas' activities, processes, and products, *see supra* ¶ 29, that form the basis of its legal conclusion, the question of whether Atlas uses an electrometallurgical process is immaterial. The Commission's finding of fact in this regard does not impact its legal conclusion that Atlas is described in SIC Code 5093 because it is primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials. The Commission did not, nor did it need to, rely on this finding of fact in reaching its legal conclusion that Atlas is described in SIC Code 5093.

¶ 40 In its reply memorandum of law, Atlas does attempt to marshal the evidence and

challenge the Commission's findings of fact underlying its legal conclusion that Atlas is primarily engaged in assembling, breaking up, sorting and wholesale distribution of scrap and waste material and therefore described in SIC Code 5093. However, this eleventh-hour attempt to marshal the evidence and challenge the sufficiency of the evidence in the reply brief is too late.

¶ 41 In challenging the Commission's findings, Atlas "bears the 'burden of demonstrating that [the] factual findings are erroneous.' " *S. Cent. Utah Tel. Ass'n, Inc. v. Auditing Div. of State Tax Comm'n,* 951 P.2d 218, 225–26 (Utah 1997) (quoting *Alta Pacific Assocs. v. State Tax Comm'n,* 931 P.2d 103, 110 (Utah 1997)). In order to prevail under such a burden, Atlas "must marshal all of the evidence supporting the findings and show despite the supporting facts and in light of the conflicting evidence, the findings are not supported by substantial evidence." *Beaver County v. State Tax Comm'n,* 916 P.2d 344, 355–56 (Utah 1996); *see also Alta Pac. Assocs.,* 931 P.2d at 110; *S. Cent. Utah Tel. Ass'n, Inc.,* 951 P.2d at 226. An appellant seeking to challenge the sufficiency of the evidence to support a finding of fact must undertake and meet its heavy marshaling burden in its opening memorandum of law on appeal. An appellant cannot hold its sufficiency of the evidence challenge in reserve and wait to marshal the evidence in its reply brief. Allowing such a procedure would deprive the appellee of any opportunity to respond and defend the sufficiency of the evidence and the findings of fact.

¶ 42 In this case, the Commission noted that Atlas' focus on challenging the sufficiency of the evidence to support the Commission's finding of fact that Atlas does not use an electrometallurgical process was misplaced. The Commission argued that Atlas had not met its marshaling burden with regard to the material findings of fact, that is, those findings of fact related to Atlas' activities, processes, and products that served as the Commission's basis for concluding that Atlas is described in SIC Code 5093. It was only at that point that Atlas attempted to address and challenge those findings of fact in its reply brief. Atlas' challenge to the sufficiency of the evidence to support those findings of fact in the reply brief was too late. The fact that the Commission, out of an abundance of caution, marshaled evidence in favor of its findings of fact and argued that evidence's legal sufficiency to support its finding of fact and ultimate legal conclusion did not give Atlas license to revive or shift the focus of its marshaling argument.

¶ 43 Therefore, we do not need to evaluate Atlas' sufficiency of the evidence challenge to the Commission's finding of fact related to SIC Code 3313 in that the finding is not relevant because we affirm the Commission's final order based upon the Commission's findings of fact supporting its legal conclusion that Atlas is described in SIC Code 5093. We accept those findings of fact as true because Atlas has failed to meet its marshaling burden in challenging those findings in its opening memorandum of law.

## CONCLUSION

¶ 44 For the foregoing reasons, we affirm the Commission's final order.

¶ 45 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice HOWE, and Justice WILKINS concur in Justice RUSSON's opinion.