2003 UT 53

## EXXONMOBIL CORPORATION, Petitioner,

v.

## UTAH STATE TAX COMMISSION, and State of Utah, Respondents.

No. 20021023.

Supreme Court of Utah.

Nov. 25, 2003.

Rehearing Denied Jan. 20, 2004.

David J. Crapo, Salt Lake City, for petitioner.

Mark L. Shurtleff, Att'y Gen., Clark L. Snelson, Asst. Att'y Gen., Salt Lake City, for respondents.

Mark K. Buchi, Steven P. Young, Salt Lake City, for amici ConocoPhillips Company, ChevronTexaco Exploration and Production Company.

Thomas W. Clawson, Salt Lake City, for amicus Union Oil Company of California.

Philip C. Pugsley, Asst. Att'y Gen., Salt Lake City, for amici Uintah Basin Revitalization Fund, Navajo Revitalization Fund.

Steven F. Alder, Asst. Att'y Gen., Salt Lake City, for amicus Utah Division of Oil, Gas, & Mining.

Bill Thomas Peters, David W. Scofield, Salt Lake City, for amicus Utah Association of Counties.

WILKINS, Justice:

¶1 ExxonMobil Corporation ("ExxonMobil") filed a petition for review of a Utah State Tax Commission ("Tax Commission") decision upholding the denial of ExxonMobil's request for a refund of allegedly miscalculated severance taxes on certain oil and gas interests. We reverse.

## FACTUAL BACKGROUND

¶2 The essential facts of this case are not in dispute. ExxonMobil requested a refund of severance taxes it believes it overpaid from January 1, 1993 through December 31, 1998. During that period, ExxonMobil operated numerous oil and gas wells in southeastern Utah that were subject to the severance tax imposed by Utah Code Ann. sections 59–5–101 through –119 (2000).

¶3 ExxonMobil's operation of the wells involves removing the oil and gas from the earth at the mouth of the well. At that point, the oil and gas is in an emulsion form, mixed with impurities such as water and sand. The impurities in the emulsion are commonly known as basic sediment and water ("BS & W"). At the point of removal

from the earth, the entire emulsion is often referred to as total production and is conveyed from the mouth of the well, through a valve structure, and usually into a separator tank or through pipelines for additional refining. The emulsion "is almost never sold directly from the [valve structure]." Selling oil and gas from the valve structure could be done, however, if some sort of portable testing device were brought to the site to measure volumes. Separator tanks are generally located in the immediate vicinity of the mouth of the well and allow the components of the emulsion to separate so that much of the BS & W is removed from the oil and gas. It appears from the record that any gas is generally separated from the rest of the emulsion at this point, while the oil and the remainder of the emulsion are transported together. Sometimes oil and gas are sold at this point, having been separated to some degree from the BS & W and readied for transport to other facilities.

¶ 4 When the oil is not sold from a separator tank, the remaining emulsion is transported to a satellite facility that further treats the emulsion for sale. Much like at a separator tank, sales also occur at this point, but operators often elect instead to transfer the oil to a tank battery facility where it is further treated and then metered at a Lease Automatic Custody Transfer ("LACT") meter and loaded onto trucks or into pipelines. Though other entities do so, during the time period in question ExxonMobil rarely sold its oil directly from separator tanks in the immediate vicinity of the well, instead transporting most of the oil to other facilities. When purchases were made in the well's vicinity, the purchase price was adjusted downward to account for the remaining impurities and transportation costs, among other things. In one transaction, the price paid by the purchaser was reduced from a posted price of $12.79 per barrel to $9.29 per barrel.

¶ 5 The Tax Commission's general practice in calculating the severance tax due on oil has apparently been to base the tax on the price of the oil at the actual point of sale. Thus, oil sold from the separator tank, with its price adjusted downward, would be taxed at a percentage of that lower price, whereas

oil sold from the battery facility would be taxed at the same rate, but on a higher purchase price.

## PROCEDURAL BACKGROUND

¶ 6 The Auditing Division of the Tax Commission ("Auditing Division") denied ExxonMobil's request for a refund of severance taxes ExxonMobil believed it had overpaid. ExxonMobil appealed that decision to the Tax Commission, which bifurcated the factual issues of what amount of tax was due and paid from the legal issue of the appropriate point for calculating the tax. The Tax Commission held a formal hearing on the second issue.

¶ 7 ExxonMobil argued that the statutory provisions regarding the severance tax required the Auditing Division to value the oil at the well site, which is the point of removal from the earth. The Auditing Division argued that valuation should occur at the point of actual sale. The relevant statutory provisions require that the tax be computed based on "the value, at the well, of the oil or gas," which is defined as "the value of oil or gas at the point production is completed." Utah Code Ann. §§. 59-5-102(1)(a), -101(19) (2000). The Tax Commission's decision was split with two of four commissioners agreeing with the Auditing Division that valuation should occur at the point of sale, which it equated with completed production. One commissioner agreed with ExxonMobil that valuation should occur at the point of removal but gave that interpretation prospective application only. The fourth commissioner also agreed that ExxonMobil's interpretation was correct, without the prospective application limitation. Thus, the Tax Commission denied ExxonMobil's request for a refund. ExxonMobil requested reconsideration of the decision, which was granted.

¶ 8 Upon reconsideration by the Tax Commission, two commissioners remained convinced of the correctness of the Auditing Division's position, while the other two commissioners remained convinced of the correctness of ExxonMobil's position. As to the prospective application of the rule, two commissioners now agreed that ExxonMobil should be entitled to relief. The Tax Com-

mission held, based on the tie vote between the four commissioners, that the Auditing Division prevailed and value would be measured at the point of sale for purposes of determining whether ExxonMobil was entitled to the requested refund. Because ExxonMobil's refund request depended upon valuation at the point of removal, summary judgment was entered against ExxonMobil. Pursuant to Utah Code Ann. section 78–2–2 (2002), ExxonMobil petitioned this court for review of the Tax Commission's decision.

¶ 9 On appeal, ExxonMobil argues that the Tax Commission erred by concluding that ExxonMobil was not the prevailing party. ExxonMobil contends that allowing the use of the Auditing Division's interpretation of the method for calculating the severance tax allows the Commission to impose a tax despite the statutory mandate that the Tax Commission act only with a quorum of three agreeing. Utah Code Ann. § 59–1–205 (2000). Further, ExxonMobil argues that the Commission erred by declaring the Auditing Division the prevailing party despite the tie vote because there is a statutory presumption against taxation that cannot be overcome without a majority vote. Lastly, ExxonMobil argues that the Tax Commission's interpretation of the statutory language in question was in error. Because we resolve this matter by statutory interpretation, we need not consider ExxonMobil's arguments regarding the failure of three members of the Tax Commission to agree on an interpretation.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 10 As questions of law, we review the Tax Commission's interpretations of the various statutory provisions implicated in this matter for correctness, according the Tax Commission's interpretations no deference. *Atlas Steel, Inc. v. Utah State Tax Comm'n,* 2002 UT 112, ¶ 14, 61 P.3d 1053.

### II. INTERPRETATION OF STATUTORY PROVISIONS

¶ 11 Two particular statutes require our review. Both address valuation, providing:

Each person owning an interest ... in oil or gas produced from a well in the state, or in the proceeds of the production, shall pay to the state a severance tax equal to 4% of the value, at the well, of the oil or gas produced, saved, and sold or transported from the field where the substance was produced.

Utah Code Ann. § 59–5–102(1)(a) (2000). " 'Value at the well' means the value of oil or gas at the point production is completed." *Id.* § 59–5–101(19). These two provisions form the crux of the dispute now before us.

¶ 12 ExxonMobil contends that the severance tax is to be calculated based on the value of the oil or gas at the point at which it is removed from the earth. It argues that although the value of its interest at the well is further defined as the point of completed production, the terms "production" and "extraction" are used synonymously and render extraction as the appropriate measure. *Id.* § 59–5–101(20). Read in light of section 59–5–103, which establishes methods of valuation, including the net-back method in which the costs of post-extraction transportation and processing are deducted from the ultimate purchase price, *id.* § 59–5–101(7), ExxonMobil argues that its interpretation is compelled by the severance tax statutes.

¶ 13 The Tax Commission counters that the statutory requirement that production be completed prior to valuation of the oil or gas necessarily implies some post-extraction alteration. Also citing the valuation section, 59–5–103, the Tax Commission argues that the clear statutory preference for valuation by reference to an arm's-length contract supports its view that measuring the value of the oil and gas at the point at which it is removed from the earth is inappropriate given the dearth of sales that occur at the immediate point of removal. Rather, the Tax Commission suggests that, in the simplest of situations, sales occur after at least some of the BS & W is removed from the emulsion by storage in the separator tank. Thus, the argument goes, the clear preference for valuing the oil or gas by utilizing an arm's-length contract price would be ill-served by a statutory scheme set up to determine value at a

point where such arm's-length sales rarely occur.

¶ 14 When we interpret a statute, we look first to the plain language. *In re Worthen*, 926 P.2d 853, 866 (Utah 1996). In doing so, we give all statutory provisions relevance and meaning independent of other provisions. *Id.* If we find ambiguity in the statute's language, we look to legislative history and other policy considerations for guidance. *Id.* In the context of a taxation statute, our evaluation of ambiguous language also requires us to " 'construe taxation statutes liberally in favor of the taxpayer, leaving it to the legislature to clarify an intent to be more restrictive if such intent exists.' " *County Bd. of Equalization of Wasatch County v. Utah State Tax Comm'n*, 944 P.2d 370, 373–74 (Utah 1997) (quoting *Salt Lake County v. State Tax Comm'n*, 779 P.2d 1131, 1132 (Utah 1989)). The statutory language in question in this case is not plain and we must resort to policy considerations and our mandate that taxing statutes be construed in favor of the taxpayer.[1] *Id.*

¶ 15 Although both ExxonMobil and the Tax Commission make reasonable arguments supporting their respective interpretations of the point of valuation of oil and gas for severance tax purposes, neither party's position completely reconciles with the valuation provisions of the severance tax statutes. Section 59–5–103 establishes the methods for computing the value of oil or gas for severance tax purposes. It provides that the value is to be "established under an arm's-length contract for the purchase of production at the well." Utah Code Ann. § 59–5–103(1) (2000). In the absence of an arm's-length contract, section 59–5–103 provides that other methods may be employed in descending order to determine value. First, value may be ascertained by reference to a non-arm's-length contract if it "is equivalent to the value received under comparable arm's-length contracts for purchases or sales of like-quality oil or gas in the same field." *Id.* § 59–5–103(1)(a). The next method of valuation allowable under section 59–5–103 allows one to determine value "by consider-

ation of information relevant in valuing like-quality oil or gas at the well in the same field or nearby fields or areas such as: posted prices, prices received in arm's-length spot sales, or other reliable public sources of price or market information." *Id.* § 59–5–103(1)(b). The final method, allowed if no other method is applicable, is the net-back method, which allows a producer to determine the value of the oil or gas by deducting costs of transporting and processing from the eventual sales or market price, up to 50% of the value of the oil or gas. *Id.* §§ 59–5–103(1)(c), –101(7). The legislature's preferences for valuing oil and gas are clear from this statute. Our interpretation of the statutory language in sections 59–5–101 and –102 must give meaning and relevance to each of the valuation methods. *In re Worthen*, 926 P.2d at 866.

¶ 16 The Tax Commission reasonably concludes that "production" supposes an alteration of the oil or gas from its natural state. However, were we to accept the Tax Commission's position, the net-back valuation method would have no relevance—a result we do not favor. *Id.* The Tax Commission's position could never result in utilization of the net-back method because any sale would necessarily be at the point of completed production, where the Tax Commission argues that valuation must occur. Thus, the transportation and refinement costs deducted under the net-back method would never be deductible from a sale price, but would merely represent added value taxed as part of the increased purchase price. Additionally, the statutory definition of "well" notes that a well is an "extractive means." Utah Code Ann. § 59–5–101(20) (2000). This seems to indicate physical extraction from the earth, not the extraction of oil or gas from other impurities further down the line as the Tax Commission suggests.

¶ 17 ExxonMobil's interpretation would require us to slight the statute, albeit to a lesser degree. Its position is roughly that oil or gas should be valued at the point of removal from the earth. This argument ignores the clear legislative preference for val-

---

1. We are not aware of, and the parties have not cited, any relevant legislative history that would inform our interpretation of the statutory provisions in question.

uation by reference to actual contracts for sale, *id.* § 59–5–103(1), because, according to the Tax Commission's unchallenged factual findings, sales rarely occur without at least some separation in a separator tank or some further refinement.

¶ 18 Both parties support their interpretations by offering various definitions of "production" from different dictionaries, cases from other courts, and unrelated statutes. Neither the Tax Commission's position nor ExxonMobil's position is compelled by the language of the statute. Likewise, there is no indication that the legislature intended its use of the word "production" in section 59–5–101(19) to be given any of the definitions suggested by the parties.

¶ 19 Given the ambiguity in the statute, we are compelled to consider the general principle that we "construe taxation statutes liberally in favor of the taxpayer, leaving it to the legislature to clarify an intent to be more restrictive if such intent exists." *County Bd. of Equalization of Wasatch County,* 944 P.2d at 373–74 (internal quotations omitted). Applying this standard, we hold that valuation does not necessarily occur at the point of sale, wherever that may be, but rather in the immediate vicinity of the point at which the oil or gas is physically removed from the earth. However, to qualify as the point at which production is complete, that point must be one at which sales of the oil and gas may actually occur.

¶ 20 "At the well," where "production is complete," read in light of the language favoring valuation by reference to an arm's-length contract price but allowing other methods, including the net-back method, contemplates valuation in the immediate vicinity of the point of removal from the earth. The Tax Commission's position regarding the statutory meaning is incorrect because it relies heavily on one interpretation of the phrase "production is completed" instead of harmonizing the various definitions at play in the severance tax statute. Accepting the Tax Commission's position would lead to a widely disparate tax, based not on the value of oil or gas actually removed from the ground and thus taken from the state's pool of natural resources, but based on the sales

and marketing strategies of the various interest holders. A producer with testing facilities on site could sell directly from the well's valve structure and pay a much smaller tax than one who removes impurities or otherwise refines the oil to sell at the battery facility. The language of the statute contemplates calculation within the immediate vicinity of the point of removal from the earth, but it also compels calculation at some point where sales are not a distinct rarity.

¶ 21 The nature of the industry is such that sales rarely, if ever, occur directly from the valve structure, which appears to be the point of valuation advocated by ExxonMobil. The statute, however, assumes a market for oil and gas at the point of valuation. Thus, although we hold that valuation is to occur in the immediate vicinity of the point of removal, it need not necessarily occur *at* the point of physical removal from the earth. There appears to be a market for oil and gas taken from the separator tanks near the well head. The Tax Commission so found, although it apparently believed the failure of ExxonMobil to sell much of its oil and gas at that point was fatal to its claim for valuation there. This was error. Valuation of the oil and gas at the separator tank allows valuation to occur while the oil and gas are in a relatively raw state, at the earliest possible, yet practicable, point of sale. Where no separator tank is used, valuation may still occur by reference to the value of similar oil at separator tanks in the same field. This valuation system allows the use of the preferences outlined in section 59–5–103, unlike the methods proposed by either of the parties.

¶ 22 The Tax Commission and amici believe an interpretation other than that adopted by the Tax Commission would drain state revenues at a time when revenue is relatively scarce. We are not blind to the impact of our holding on the amount of taxes collected and distributed to various governmental entities, but any concerns we have with the reduction of revenue are not properly assuaged by an ends-based statutory interpretation. If the legislature established the severance tax scheme to realize a specific revenue target and our interpretation of its statutory language does not provide that lev-

el of revenue, the legislature may amend the relevant statutes to provide for a different calculation of the tax that will achieve the desired revenue.

### III. APPLICATION OF OUR DECISION

¶ 23 The revenue concerns cited by the Tax Commission and amici convince us that application of our prospective effect doctrine is appropriate in this case. When invalidating the actions of a taxing authority, we have long recognized that our decisions may be given prospective effect to protect the solvency of governmental entities and to avoid administrative and financial hardship caused by retroactive application of rules contrary to those relied on by the taxing authorities. *See, e.g., Rio Algom Corp. v. San Juan County,* 681 P.2d 184, 196 (Utah 1984). We recognize, however, that preventing the retroactive application of the rule to ExxonMobil, which has expended considerable time and resources to attack the actions of the Tax Commission, would both deprive ExxonMobil of the fruits of victory and "potential[ly] ... discourag[e] other litigants from challenging [actions] of questionable validity." *V–1 Oil Co. v. Utah State Tax Comm'n,* 942 P.2d 906, 914 (Utah 1996) (citing *Rio Algom,* 681 P.2d at 196), *vacated on other grounds,* 942 P.2d 915 (Utah 1997). We give our holding this selectively prospective application because we are convinced that retroactive application could result in large refunds of taxes already collected and spent by governmental entities. Although the full breadth and depth of the impact is not immediately apparent from the record before us, no doubt it would be substantial and involve funds already budgeted, collected, and spent. Large refunds of money already collected and spent would pose a great burden on the amici revitalization funds and other relatively small governmental entities operating on correspondingly small budgets. Thus, whether in refund requests or deficiency proceedings, as to all but ExxonMobil the rule announced today is to have prospective application only.

### CONCLUSION

¶ 24 We reverse the Tax Commission's determination that severance taxes should be based on the value of oil and gas at the point of eventual sale. Valuation must occur in the immediate vicinity of the well, with the oil and gas remaining in a relatively natural state. Although ExxonMobil is entitled to further adjudication of its claim for a refund, as to other parties who may have refund requests, deficiency proceedings, or similar matters pending before the Tax Commission, our holding is to apply prospectively only. Reversed.

¶ 25 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Justice WILKINS' opinion.