2005 UT 36

**ANDERSON DEVELOPMENT COM-PANY, L.C., a Utah limited liability company, Plaintiff and Appellee,**

v.

**Janalee S. TOBIAS, an individual, Judy Feld, an individual; Save Our South Jordan River Valley, Inc., a Utah corporation, dba SOS and Save Open Spaces; Brent Foutz; and Jane and John Does 1 through 20, inclusive, Defendants and Appellants.**

Nos. 20030469, 20030690.

Supreme Court of Utah.

June 14, 2005.

D. Miles Holman, Jeffrey N. Walker, Peter C. Schofield, Sandy, for appellee.

Dale F. Gardiner, Douglas J. Parry, Jennie B. Garner, Salt Lake City, for appellants.

PARRISH, Justice:

¶ 1 This appeal arises from a dispute over a proposed commercial development near the Jordan River. When defendants Janalee Tobias and Judy Feld ("Tobias and Feld") formed an entity to organize opposition to the development, the developer, Anderson Development Company ("ADC"), filed suit for intentional interference with economic relations. Tobias and Feld, in turn, filed multiple counterclaims. After the district court entered several orders adverse to Tobias and Feld, they sought permission to pursue two interlocutory appeals, which we granted. For reasons detailed below, we reverse in part and affirm in part.

## BACKGROUND

¶ 2 In 1996, ADC initiated efforts to develop a commercial project near the Jordan River known as the RiverPark Business Park. To secure the site for the proposed development, ADC began entering into real estate purchase contracts with owners of property located along the Jordan River. In October 1996, ADC entered into one such contract with Boyd and Dorothy Williams (the "Williamses"). Under its contract with the Williamses, ADC's purchase obligation was subject to several contingencies, including the "[s]uccessful completion of ... masterplanning and zoning" amendments, which, if not satisfied or waived by ADC by June 30, 1997, would result in the expiration of the contract. In accordance with these terms, ADC filed, as agent of the Williamses, an application for a master plan and zoning change with South Jordan City.

¶ 3 Tobias and Feld, residents of South Jordan City, strongly opposed ADC's proposed development and actively protested against any zoning change, urging the City and its residents to "Save our South Jordan River Valley." As part of their opposition, Tobias and Feld voiced their concerns both to the property owners who had entered into real estate purchase contracts with ADC and to the South Jordan City Council ("City Council"), the entity responsible for acting on ADC's zoning application.

¶ 4 Tobias and Feld's active opposition to the project began shortly after they received notice that South Jordan's Planning and Zoning Commission ("Commission") would consider ADC's zoning application during a meeting scheduled for November 20, 1996. On November 18, 1996, Tobias and Feld met with other South Jordan City residents to strategize regarding how best to squelch ADC's proposed zoning application and to form an organization known as "SOS," or "Save our South Jordan River Valley," to actively oppose the development. Two days later, Tobias, Feld, and other like-minded residents of South Jordan attended the Commission's meeting to express their opposition to the proposed zoning changes. The meeting lasted several hours, and many of the nearly ninety residents who attended the meeting addressed ADC's development project. At the conclusion of the meeting, the Commission voted on ADC's application. The vote was split, with two members of the Commission voting in favor of the zoning change and two opposing the change. Consequently, the Commission sent the matter to the City Council for the purpose of taking public comment.

¶ 5 To prepare for the City Council meeting, Tobias, Feld, and other SOS members distributed fliers to South Jordan residents to raise awareness of, and encourage opposition to, the project. Additionally, they voiced their concerns to the offices of several politicians, including that of then-Governor Michael Leavitt, and to several representatives of organizations dedicated to the preservation of open space, including Wendy Fisher of Utah Open Lands. Tobias and Feld also met with other South Jordan City residents, including the Williamses, to discuss alternatives to the proposed development. ADC alleges that, during these meetings with the Williamses, Tobias and Feld repeatedly urged the Williamses to breach their real estate purchase contract with ADC.

¶ 6 On the day of the scheduled City Council meeting, December 17, 1996, Tobias and Feld received a letter from ADC, stating, in part:

> We recognize that you have rights to speak out about this project. However, your rights are not without limit. Your efforts to interfere with our contractual relationships and with an effort to delay our due process at South Jordan City clearly extend beyond the limits of the law. We will respect your rights but will insist that you respect our rights also. Any effort by you or anyone else to interfere with any [of] our rights may subject each person involved to the possibility of litigation and the payment of damages. Damages literally could be in the millions of dollars.

¶ 7 Despite ADC's warning, Tobias and Feld attended the City Council meeting, where they, along with other members of SOS, protested the proposed development. At the conclusion of the meeting, the City Council decided to delay any vote on ADC's

application until a subcommittee could review the issues and provide a recommendation.

¶ 8 On April 28, 1997, on the recommendation of the City Administrator, the City Council voted to approve ADC's application for a zoning change for all properties that ADC had under contract, with the exception of the Williamses' property. The City Council postponed any zoning decision on the Williamses' property, due, in part, to Tobias and Feld's request for additional time to raise funds to purchase that land. As a result, the City Council failed to act on the zoning changes for the Williamses' property by June 30, 1997, the date specified in the real estate purchase agreement for meeting the zoning contingency. Because ADC elected not to waive the zoning contingency, its real estate purchase contract with the Williamses expired.

¶ 9 After the expiration of the real estate purchase contract, Tobias and Feld informed the Williamses that they had undertaken efforts to raise funds to purchase the land so that it could be preserved as open space. As a result of these efforts, the Williamses received several inquiries regarding the possible purchase of their land. One such inquiry was from Wendy Fisher of Utah Open Lands. Other "expressions of interest" came from Jim Davis, a representative of the Trust for Public Lands, and Salt Lake County Commissioners Randy Horiuchi and Brent Overson.

¶ 10 Despite these "expressions of interest," the Williamses received no written offers to purchase their land. The only offer they received was an oral one from Ms. Fisher, on behalf of Utah Open Lands, to match any offer made by ADC. The Williamses continued to negotiate with ADC and, on November 25, 1997, entered into a second real estate purchase contract with ADC. This contract, like the first, was conditioned on a successful zoning change. However, the Williamses used the expressions of interest in their land as leverage to successfully negotiate a contract with ADC that was more favorable to them than the first. Specifically, the second contract increased the purchase price by more than $175,000 and contained additional restrictions on the land, including use restrictions, a restriction on the height of any buildings to be constructed, and a ten-foot right-of-way. ADC asserts that these changes increased its cost by more than $1,000,000.

¶ 11 After entering into the second real estate purchase contract with the Williamses, ADC assigned its interest in the contract to LakeView Farms with the understanding that ADC would share in the profits derived from the purchase of the land. The City Council voted to approve ADC's zoning application with respect to the Williamses' property on March 11, 1998, and the sale of the property closed on April 17, 1998.

¶ 12 On March 17, 1998, ADC filed suit against Tobias, Feld, SOS, and others,[1] alleging that they had intentionally interfered with ADC's prospective economic relations and existing contractual relations. ADC's complaint alleged two causes of action against Tobias and Feld. In its first cause of action, ADC asserted that Tobias and Feld used improper means to intentionally interfere with its potential economic relations by falsely representing to the Williamses that they could sell their land for a price higher than that offered by ADC if they sold to an individual or organization willing to preserve the land's open space. In its second cause of action, ADC alleged that Tobias and Feld "wilfully and recklessly contacted [the Williamses] in attempts to induce [them] to not sell the Subject Property" to ADC while the first real estate purchase contract was in effect, thereby interfering with ADC's existing contractual relations. Additionally, ADC constructively amended its complaint through subsequent motions, as discussed below, to plead a third cause of action. In this cause of action, ADC claimed that Tobias and Feld intentionally interfered with its existing economic relations by petitioning the City Council to delay the zoning decision on the Williamses' property so that Tobias and Feld would have time to seek funding to purchase

---

1. During the course of the proceedings, all defendants other than Tobias and Feld either were dismissed from the action or did not join in Tobias and Feld's petitions for interlocutory appeal and therefore are not parties to this appeal.

the land themselves and that this delay resulted in the expiration of ADC's first contract with the Williamses. On the basis of these alleged wrongdoings, ADC petitioned the district court to enjoin Tobias and Feld from any further interference with its contractual and economic relations.

¶ 13 On April 21, 1998, Tobias and Feld filed a motion to dismiss ADC's claims, which the district court denied. On June 10, 1999, ADC filed an amended complaint, which restated its original claims with few exceptions. The litigation then languished. After more than two years of inaction, the district court notified the parties that ADC's complaint would be dismissed unless ADC filed a certificate of readiness for trial within twenty days. ADC complied with this requirement on October 12, 2001. Thereafter, Tobias and Feld moved for summary judgment on ADC's claims and sought leave to file a counterclaim. ADC responded with a cross-motion for summary judgment on its claims against Tobias and Feld.

¶ 14 The district court denied the cross-motions for summary judgment on May 28, 2002, but granted Tobias and Feld's motion for leave to plead a counterclaim. On July 2, 2002, Tobias and Feld filed multiple counterclaims against ADC, including a counterclaim pursuant to section 78–58–105 of the Utah Code (the "SLAPP Act counterclaim"),[2] as well as counterclaims for wrongful civil proceedings, intentional and negligent infliction of emotional distress, abuse of process, attorney fees for filing a meritless claim in bad faith, and punitive damages. On November 26, 2002, ADC moved for summary judgment on the SLAPP Act counterclaim, arguing that the Act did not apply retroactively to ADC's actions. On December 16, 2002, ADC moved to dismiss the remaining common law counterclaims.

¶ 15 On January 27, 2003, the district court heard argument on ADC's motion for summary judgment on the SLAPP Act counterclaim and on its motion to dismiss the common law counterclaims. The district court ruled in favor of ADC, granting its motion for summary judgment on the SLAPP Act

counterclaim and its motion to dismiss the counterclaims for intentional and negligent infliction of emotional distress, wrongful civil proceedings, and punitive damages. It ruled against ADC, however, on its motion to dismiss the counterclaims for abuse of process and attorney fees. The district court entered an order memorializing these rulings on March 10, 2003, but subsequently struck the order, referring the matter to mediation.

¶ 16 When mediation between the parties failed, the district court entered a substitute order granting ADC's motion for summary judgment on the SLAPP Act counterclaim. As had the original order, the substituted order also granted ADC's motion to dismiss the counterclaims for wrongful civil proceedings, intentional and negligent infliction of emotional distress, and punitive damages and denied ADC's motion to dismiss the counterclaims for abuse of process and attorney fees. Tobias and Feld filed a timely petition to appeal this interlocutory order, which we granted.

¶ 17 After the January 27, 2003 hearing, when the district court announced that it would deny ADC's motion to dismiss Tobias and Feld's abuse of process counterclaim, ADC filed a separate motion for summary judgment directed to that claim. During this same period, Tobias and Feld again moved for summary judgment on ADC's claims for intentional interference with economic relations. The district court resolved both motions on August 4, 2003, granting ADC's motion for summary judgment on the abuse of process counterclaim and denying Tobias and Feld's motion for summary judgment on ADC's intentional interference with economic relations claims. Tobias and Feld also sought permission to seek an interlocutory appeal of this order, which we granted. Thereafter, we consolidated the two interlocutory appeals into the present case.

¶ 18 In this appeal, we decide whether the district court erred when it (1) denied Tobias and Feld's motion for summary judgment on ADC's claims of intentional interference with economic relations, (2) granted ADC's motion

---

2. The legislature enacted sections 78–58–101 to –105 of the Utah Code (the "SLAPP Act") in 2001 to counteract strategic lawsuits against public participation.

for summary judgment on Tobias and Feld's SLAPP Act counterclaim, (3) dismissed Tobias and Feld's intentional and negligent infliction of emotional distress counterclaims, (4) granted ADC's motion for summary judgment on Tobias and Feld's abuse of process counterclaim, and (5) dismissed Tobias and Feld's counterclaim for punitive damages. We discuss each issue in turn.

## ANALYSIS

### I. ADC'S CLAIMS FOR INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

¶ 19 We first address ADC's claims against Tobias and Feld for intentional interference with economic relations. The district court denied Tobias and Feld's motion for summary judgment on this claim, ruling that ADC had "set forth facts ... sufficient to preclude summary judgment." Summary judgment is appropriate "when the evidence 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Progressive Cas. Ins. Co. v. Dalgleish*, 2002 UT 59, ¶ 11, 52 P.3d 1142 (quoting Utah R. Civ. P. 56(c)). "When reviewing a district court's denial of summary judgment, we grant no deference to the district court's legal conclusions and review them for correctness." *Schaerrer v. Stewart's Plaza Pharmacy, Inc.*, 2003 UT 43, ¶ 14, 79 P.3d 922.

¶ 20 A claim for intentional interference with economic relations "protects both existing contractual relationships and prospective relationships of economic advantage not yet reduced to a formal contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991). To succeed on such a claim, a plaintiff must demonstrate that "(1) ... the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982). With respect to the second element, only one alternative, either improper purpose or improper means, need be established; a plaintiff need not prove both. *See id.* at 307. To establish the first alternative, improper purpose, it is not enough to show that the defendant was motivated by ill will toward the plaintiff. *See id.* Rather, the plaintiff must show that the defendant's "predominant purpose was to injure the plaintiff." *Id.* To establish the second alternative, improper means, a plaintiff must show "that the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession." *Pratt v. Prodata, Inc.*, 885 P.2d 786, 787 (Utah 1994) (internal quotations omitted).

¶ 21 ADC asserts that Tobias and Feld used improper means to tortiously interfere with its economic relations when they (1) urged the Williamses to breach the first real estate purchase contract, (2) convinced the City Council to delay the zoning application for the Williamses' property until after the expiration of the first real estate purchase contract, and (3) artificially inflated the purchase price of the property in the second real estate purchase contract by misrepresenting their ability to either purchase the property themselves or secure a buyer willing and able to do so. We discuss each claim in turn.[3]

3. Tobias and Feld contend that their motion for summary judgment should have been granted with respect to all of ADC's claims for intentional interference with economic relations because ADC's memorandum in opposition to Tobias and Feld's motion for summary judgment failed to "specifically controvert[ ]" each of the numbered facts set forth in Tobias and Feld's memorandum in support of their motion for summary judgment, as required by rule 4–501(2)(B) of the Utah Rules of Judicial Administration, as it existed in 2002. However, district courts have " 'discretion in requiring compliance with rule 4–501.'" *Gary Porter Constr. v. Fox Constr., Inc.*, 2004 UT App 354, ¶ 10, 101 P.3d 371 (quoting *Fennell v. Green*, 2003 UT App 291, ¶ 9, 77 P.3d 339). While the district court could have granted Tobias and Feld's motion for summary judgment on the basis of ADC's noncompliance with rule 4–501, it exercised its discretion to address the motion on its merits, and we are unpursuaded that doing so constituted an abuse of that discretion.

*A. Did Tobias and Feld Intentionally Interfere with ADC's Economic Relations When They Contacted the Williamses During the Term of the First Contract?*

¶ 22 Tobias and Feld contend that the district court erred in denying their motion for summary judgment on ADC's first intentional interference with economic relations claim because the alleged conduct did not result in any injury to ADC. We agree.

¶ 23 To successfully defend against a motion for summary judgment, the nonmoving party must set forth facts " 'sufficient to establish the existence of an element essential to that party's case.' " *Burns v. Cannondale Bicycle Co.,* 876 P.2d 415, 419 (Utah Ct.App.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Failure to do so with regard to any of the essential elements of that party's claim will result in a conclusion that the moving party "is entitled to a judgment as a matter of law." *Id.* at 420; *see also Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 ("In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." (quoting Fed.R.Civ.P. 56(c))).

¶ 24 Although a claim of intentional interference with economic relations is comprised of three elements, we address only the element of injury because it is dispositive. ADC's allegations that Tobias and Feld repeatedly urged the Williamses to breach the first contract are immaterial because it is uncontested that the Williamses did not breach that contract. Rather, the contract expired because the City Council refused to approve ADC's application for a zoning change by the deadline specified in the contract, a condition precedent to ADC's obligation to perform that ADC elected not to waive. Consequently, ADC was not injured as a result of Tobias and Feld's alleged urging that the Williamses breach their contract with ADC. Because ADC cannot establish injury, the district court erred in denying Tobias and Feld's motion for summary judgment on ADC's first claim of intentional interference.

*B. Did Tobias and Feld Intentionally Interfere with ADC's Economic Relations by Urging the City Council to Deny ADC's Zoning Application?*

¶ 25 ADC's second claim for intentional interference is based on Tobias and Feld's efforts to derail ADC's zoning change application, which was before the City Council. Tobias and Feld argue that the district court erred when it denied their motion for summary judgment on this claim because their petitions to the City Council were privileged under the First Amendment of the United States Constitution and the *Noerr–Pennington* Doctrine. Although ADC failed to plead this claim in its original or amended complaint, both parties addressed this issue on the merits in the summary judgment proceedings, and it was included in the scope of the petition for interlocutory appeal. Consequently, we deem ADC's complaint "to be constructively amended to include" this claim. *Wahlstrom v. Kawasaki Heavy Indus.,* 4 F.3d 1084, 1087 (2d Cir.1993).

¶ 26 The First Amendment to the United States Constitution guarantees citizens the right to "petition the Government for a redress of grievances." U.S. Const. amend. I. In recognition of this right, the United States Supreme Court has held that individuals and organizations are immune from liability under antitrust laws for actions constituting petitions to the government. *See United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 138, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Over the years, courts have extended this immunity doctrine, referred to as the *Noerr–Pennington* Doctrine, *see R.A.V. v. City of St. Paul,* 505 U.S. 377, 420, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), to "protect . . . political activity against tort claims as well as antitrust claims," *Searle v. Johnson,* 646 P.2d 682, 684 (Utah 1982).

¶ 27 An exception to this immunity doctrine exists for actions constituting a "sham." *See City of Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). "A 'sham'

situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means." *Id.* (internal quotations and citations omitted). Therefore, under the "sham" exception, an individual will be liable if he "use[s] the governmental *process*—as opposed to the *outcome* of that process—as [a] ... weapon." *Id.*

¶ 28 ADC has failed to allege any facts that would bring Tobias and Feld's actions within the "sham" exception to the *Noerr–Pennington* Doctrine. ADC has not alleged that Tobias and Feld's petitions to the City Council were designed solely to harass ADC. To the contrary, it is uncontested that Tobias and Feld's petitions to the City Council were genuinely designed to achieve their desired outcome—the denial of ADC's zoning application. Even if, as ADC alleges, Tobias and Feld misrepresented to the City Council their ability to raise funds to purchase the land, the use of that "improper means" would not be sufficient to except Tobias and Feld from the immunity provided under the *Noerr–Pennington* Doctrine in light of their uncontested intent to achieve a favorable governmental result. *See Omni,* 499 U.S. at 380, 111 S.Ct. 1344. Because Tobias and Feld's actions in petitioning the City Council fall under the *Noerr–Pennington* Doctrine, the district court erred when it denied their motion for summary judgment on this claim.

*C. Did Tobias and Feld Intentionally Interfere with ADC's Economic Relations by Misrepresenting Their Ability to Raise Funds or Find a Willing and Able Buyer to Purchase the Williamses' Property?*

¶ 29 In its third claim of intentional interference, ADC alleges that Tobias and Feld intentionally interfered with its economic relations by misrepresenting to the Williamses their ability to purchase the property themselves or to secure a buyer willing and able to do so. ADC asserts that those misrepresentations were improper and therefore satisfy its obligation to establish the element of interference by improper means or for an

improper purpose. Additionally, ADC contends that those misrepresentations enabled the Williamses to extract a higher purchase price for the property than would have been possible otherwise, thereby damaging ADC. As such, ADC claims that the district court properly denied Tobias and Feld's motion for summary judgment.

¶ 30 Tobias and Feld disagree, arguing that the district court erred when it denied their motion for summary judgment on this claim because ADC cannot establish that they made any misrepresentations to the Williamses or that ADC was, in fact, damaged by any such misrepresentations. In so arguing, Tobias and Feld rely on the undisputed fact that Wendy Fisher, an individual they contacted, offered to purchase the property. They assert that this fact renders ADC incapable of demonstrating that they utilized improper means to interfere with the development project. Additionally, Tobias and Feld argue that none of the alleged misrepresentations were the actual and proximate cause of any damages sustained by ADC. Consequently, Tobias and Feld claim that summary judgment was appropriate on this claim.

¶ 31 When reviewing a district court's grant or denial of a motion for summary judgment, we view the facts in "a light most favorable to the party opposing the motion." *Billings v. Union Bankers Ins. Co.,* 819 P.2d 803, 803 (Utah 1991); *see also Estate Landscape & Snow Removal Specialists, Inc. v. Mountain States Tel. & Tel. Co.,* 844 P.2d 322, 324 n. 1 (Utah 1992) ("[A] reviewing court should recite the facts in the light most favorable to the nonmoving party."). Applying that standard here, we conclude that ADC set forth sufficient facts to withstand summary judgment on its third claim for intentional interference.

¶ 32 As to the first element, ADC has identified facts suggesting that Tobias and Feld intentionally interfered with ADC's potential economic relations when they contacted the Williamses in an attempt to encourage them to preserve their land as open space. As to the second element, improper means, ADC produced evidence that Tobias and Feld represented to the Williamses that

they had received a written offer to purchase the property. While there is evidence that Tobias and Feld actively worked to raise funds and to secure a buyer so that the property could be preserved as open space, there is no evidence that they ever received a *written* offer to purchase the property. Accordingly, the Williamses' sworn statements that Tobias and Feld misrepresented the fruits of their labor are sufficient to create a genuine issue of material fact with respect to the improper means element of their claim. *See Holbrook Co. v. Adams*, 542 P.2d 191, 193 (Utah 1975) ("[I]t only takes one sworn statement under oath to dispute the averments on the other side of the controversy and create an issue of fact.").

¶ 33 We next turn to the third element, the issue of damages. To state a claim for interference, ADC has the obligation of pleading that Tobias and Feld's interference by improper means actually injured ADC. Accordingly, to withstand summary judgment, ADC would need to present evidence that the ultimate purchase price for the Williamses' property was higher than it would have been absent Tobias and Feld's alleged misrepresentations. Although the evidence in support of this element is thin, we conclude that it is nevertheless sufficient to withstand summary judgment. Specifically, Boyd Williams testified that the price for the second real estate purchase contract was higher than the first because he concluded that "if ADC didn't pay this higher price [then] I could get this much from [Tobias] and [Feld] or their contacts." This testimony gives rise to the inference that the alleged misrepresentations resulted in ADC paying more for the property than it otherwise would have. Accordingly, we conclude that ADC identified a sufficient factual basis to avoid summary judgment on the element of damages.

¶ 34 Although we agree with the district court that ADC identified sufficient facts to withstand summary judgment on this claim, a note of caution is appropriate with respect to the applicable measure of damages. The damages ADC may recover under this claim are limited to those it incurred as a direct result of Tobias and Feld's alleged misrepre-

sentations to the Williamses regarding the existence of the *written* offer to purchase the property. The mere fact that the price for the property under the second real estate purchase contract was higher than the price under the first contract does not establish that the alleged misrepresentations caused ADC's damages. Indeed, it may be that the fair market value of the property increased during the period of time that elapsed between the negotiation of the first and second contracts. It also may be that the Williamses were able to secure a higher price in the second contract because of the numerous legitimate expressions of interest in the property they received after the expiration of the first contract. If such is the case, the increased purchase price is not the result of the alleged misrepresentations made by Tobias and Feld with respect to the existence of the written offer, but rather, the result of market forces that came into play when ADC allowed the first real estate purchase contract to lapse. If so, ADC would not be able to recover damages for the higher purchase price under this claim.

## II. TOBIAS AND FELD'S SLAPP ACT COUNTERCLAIM

¶ 35 We next consider Tobias and Feld's SLAPP Act counterclaim. The district court granted ADC's motion for summary judgment on the SLAPP Act counterclaim, holding that the SLAPP Act did not apply to ADC's suit against Tobias and Feld, which had commenced some three years before the Act's enactment. As we noted above, summary judgment is appropriate "when the evidence 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Progressive Cas. Ins. Co. v. Dalgleish*, 2002 UT 59, ¶ 11, 52 P.3d 1142 (quoting Utah R. Civ. P. 56(c)). In reviewing a grant of summary judgment, "we review the lower court's legal conclusions for correctness." *Id.*

¶ 36 The Utah Legislature enacted the Citizen Participation in Government Act ("SLAPP Act"), sections 78–58–101 to –105 of the Utah Code, in 2001. Prevention of Retal-

iatory Lawsuits Act, ch. 163, 2001 Utah Laws 823, 823. Section 78–58–103 provides:

(1) A defendant in an action who believes that the action is primarily based on, relates to, or is in response to an act of the defendant while participating in the process of government and is done primarily to harass the defendant, may file:

(a) an answer supported by an affidavit of the defendant detailing his belief that the action is designed to prevent, interfere with, or chill public participation in the process of government, and specifying in detail the conduct asserted to be the participation in the process of government believed to give rise to the complaint; and

(b) a motion for judgment on the pleadings in accordance with the Utah Rules of Civil Procedure Rule 12(c).

Utah Code Ann. § 78–58–103(1) (2002).

¶ 37 Additionally, section 78–58–104 of the SLAPP Act provides that, once a party files a motion for judgment on the pleadings, "the trial court shall hear and determine the motion as expeditiously as possible with the moving party providing by clear and convincing evidence that the primary reason for the filing of the complaint was to interfere with the first amendment right of the defendant." *Id.* § 78–58–104(1)(b). If the district court finds "that the primary purpose of the action is to prevent, interfere with, or chill the moving party's proper participation in the process of government," it "shall grant the motion and dismiss the action." *Id.* § 78–58–104(2).

¶ 38 The last section of the SLAPP Act, section 78–58–105, provides as follows:

(1) A defendant in an action involving public participation in the process of government may maintain an action, claim, cross-claim, or counterclaim to recover:

(a) costs and reasonable attorney's fees, upon a demonstration that the action involving public participation in the process of government was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the

extension, modification, or reversal of existing law; and

(b) other compensatory damages upon an additional demonstration that the action involving public participation in the process of government was commenced or continued for the purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting the free exercise of rights granted under the First Amendment to the U.S. Constitution.

(2) Nothing in this section shall affect or preclude the right of any party to any recovery otherwise authorized by law.

*Id.* § 78–58–105.

¶ 39 ADC advances five arguments in support of the district court's decision to grant its motion for summary judgment on the SLAPP Act counterclaim. First, ADC argues that the individual sections of the SLAPP Act are dependent upon each other, thereby limiting a party's ability to bring a claim or counterclaim under section 78–58–105 to those instances where the party has established a claim under sections 78–58–103 and –104. Second, ADC argues that the SLAPP Act is inapplicable here because its lawsuit against Tobias and Feld was filed prior to the enactment of the Act. Third, ADC argues that Tobias and Feld's claims must fail because ADC's lawsuit had a substantial basis in fact and law. Fourth, ADC claims the SLAPP Act is inapplicable because Tobias and Feld's activities, which are the subject of ADC's lawsuit, did not "involve the governmental process." Finally, ADC asserts that the counterclaim violates its constitutional rights, including the constitutional prohibition against unlawful bills of attainder. We address each argument in turn.

¶ 40 We first address ADC's argument that Tobias and Feld are precluded from bringing a counterclaim under section 78–58–105 of the SLAPP Act because they failed to comply with the requirements of sections 78–58–103 and –104. "[W]hen deciding questions of statutory interpretation, we do not look to language in isolation. Rather, we look first to the statute's plain language, in relation to the statute as a whole, to determine its meaning." *Calhoun v. State Farm Mut. Auto. Ins. Co.,* 2004 UT 56, ¶ 18,

96 P.3d 916. "[O]ur primary goal in interpreting statutes is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve." *State v. Burns,* 2000 UT 56, ¶ 25, 4 P.3d 795. Only if we conclude that the statutory language is ambiguous do we "look to legislative history and other policy considerations for guidance." *ExxonMobil Corp. v. State Tax Comm'n,* 2003 UT 53, ¶ 14, 86 P.3d 706.

¶ 41 The unambiguous language of the SLAPP Act contemplates two distinct remedies for an individual who is improperly sued for participating in the process of government. The first remedy is specified in sections 78–58–103 and –104. Under those sections, a defendant may defend against the action by filing a motion for judgment on the pleadings, which the district court must grant if it concludes that there is clear and convincing evidence "that the primary purpose of the action is to prevent, interfere with, or chill the moving party's proper participation in the process of government." Utah Code Ann. § 78–58–104(2). Alternatively, the defendant may bring a separate cause of action for damages against the original complainant. This second alternative, specified by section 78–58–105 of the SLAPP Act, is distinct from the alternative specified by sections 78–58–103 and –104.

¶ 42 We recognize that section 78–58–103 is entitled "Applicability" and that section 78–58–104 is entitled "Procedures," providing some support for ADC's argument that a claim brought under section 78–58–105 must first satisfy the rigors of sections 78–58–103 and –104. Nevertheless, "a statute's title is not part of its text and cannot be used as a tool of statutory construction unless the statute's language is ambiguous." *Stephens v. Bonneville Travel,* 935 P.2d 518, 521–22 (Utah 1997).

¶ 43 The language in sections 78–58–103 and –104 is not ambiguous. Those sections clearly specify the procedural requirements for succeeding on a motion for judgment on the pleadings, and there is no indication that an individual must obtain a judgment on the pleadings pursuant to sections 78–58–103 and –104 before bringing a cause of action under section 78–58–105. Indeed, section 78–58–105 contains no reference at all to the prior sections of the SLAPP Act. We therefore hold that section 78–58–105 unambiguously provides a remedy independent from that provided by sections 78–58–103 and –104 for all actions "commenced or continued" under the conditions described in subsections 78–58–105(1)(a) and (b) and that a targeted individual is not required to comply with sections 78–58–103 and –104 before proceeding under section 78–58–105.

¶ 44 We further hold that a targeted individual is not required to prove a claim or counterclaim brought pursuant to section 78–58–105 by the burden of proof specified in section 78–58–104. The clear and convincing standard articulated in section 78–58–104 is applicable only to a motion for judgment on the pleadings brought under that section. Individuals asserting a claim or counterclaim under section 78–58–105 must meet the typical burden of proof applicable to civil actions generally, a preponderance of the evidence, and whether a targeted individual satisfies the elements of subsections 78–58–105(1)(a) and (b) by that standard is a question of fact to be determined by the factfinder.

¶ 45 In its second argument, ADC argues that the district court properly granted summary judgment in its favor on the SLAPP Act counterclaim because the SLAPP Act was not intended to be applied retroactively and because ADC did nothing to inhibit the exercise of Tobias and Feld's First Amendment rights after the Act was enacted. We agree that the SLAPP Act cannot operate retroactively because the legislature did not expressly provide for such operation. *See Goebel v. Salt Lake City S. R.R.,* 2004 UT 80, ¶ 39, 104 P.3d 1185 (noting that a statute affecting substantive rights "is not to be applied retroactively unless the statute expressly declares that it operates retroactively"). Nevertheless, we conclude that ADC may still be subject to liability under a prospective application of the SLAPP Act. Indeed, the SLAPP Act provides that a targeted individual may recover fees and costs if he is able to demonstrate that a complaint was "commenced *or contin-*

*ued* without a substantial basis in fact and law." Utah Code Ann. § 78–58–105(1)(a) (emphasis added). It also provides that a party may recover compensatory damages if, in addition to demonstrating that an original complaint was brought without substantial basis in fact and law, he is able to prove by a preponderance of the evidence that the action was "commenced *or continued* for the purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting the free exercise of rights granted under the First Amendment." *Id.* § 78–58–105(1)(b) (emphasis added).

¶ 46 When construing statutes, we "assume that each term included in the [statute] was used advisedly." *Carrier v. Salt Lake County*, 2004 UT 98, ¶ 30, 104 P.3d 1208. The legislature's explicit use of the phrase "commenced or continued" demonstrates its unmistakable intent to subject a party to liability under the SLAPP Act if that party *either* commenced *or* continued to pursue a proscribed lawsuit after the effective date of the Act. Although ADC initially filed its suit against Tobias and Feld before the passage of the SLAPP Act, it continued its lawsuit after the Act became effective. Consequently, the district court erred in holding that Tobias and Feld could not maintain their counterclaim under the SLAPP Act.

¶ 47 Moreover, because the statute includes harassment, intimidation, and punishment in its list of proscribed purposes, a party may be liable for commencing or continuing a lawsuit even if the suit was not brought solely to inhibit the targeted individual's exercise of First Amendment rights. Because Tobias and Feld's counterclaim alleges that ADC continued the lawsuit for the purpose of punishing Tobias and Feld for their opposition to the zoning change, we hold that they have pled a cognizable claim under section 78–58–105.

¶ 48 We pause to note, however, that if Tobias and Feld are ultimately successful on their SLAPP Act counterclaim, the costs, fees, and damages recoverable under section 78–58–105 will be limited to those incurred *after* the passage of the Act. To hold otherwise would result in a retroactive application of the statute, a prohibited result. *See Olsen v. Samuel McIntyre Inv. Co.*, 956 P.2d 257, 261 (Utah 1998) ("A long-standing rule of statutory construction is that we do not apply retroactively legislative enactments that alter substantive law or affect vested rights unless the legislature has clearly expressed that intention.").

¶ 49 In its third argument, ADC asserts that we should uphold the summary dismissal of the SLAPP Act counterclaim because ADC's lawsuit against Tobias and Feld had a substantial basis in fact and law, as evidenced by the district court's refusal to dismiss the lawsuit on summary judgment. We are unpersuaded. Because dismissal of a claim based on either a motion to dismiss or a motion for summary judgment denies the nonmoving party of the right to litigate his claim on the merits, the threshold for surviving such a motion is relatively low. *See Buckner v. Kennard*, 2004 UT 78, ¶ 9, 99 P.3d 842 ("Only if it is clear that the claimant is not entitled to relief under any state of facts that could be proven to support the claim should a motion to dismiss be granted."); *Staker v. Ainsworth*, 785 P.2d 417, 429 (Utah 1990) ("To successfully oppose a motion for summary judgment, it is not necessary for the party to prove its legal theory. Indeed, it only requires one sworn statement to dispute the claims on the other side of the controversy and create an issue of fact." (footnote omitted)). Meeting this threshold does not equate to a demonstration that the claims are supported by a *substantial* basis in fact and law. Accordingly, Tobias and Feld may properly pursue their cause of action under section 78–58–105 despite the fact that ADC's claim against them for intentional interference with economic relations survived a motion to dismiss and motions for summary judgment.

¶ 50 In its fourth argument, ADC contends it was entitled to summary judgment on the SLAPP Act counterclaim because its lawsuit against Tobias and Feld was directed at activities not materially related to participation in the process of government. We disagree. Tobias and Feld have alleged that ADC sued them because of their vocal

opposition to ADC's zoning application, which was before the City Council. This is sufficient to establish the element of participation in the process of government, and Tobias and Feld accordingly satisfied the requirements for pleading a cognizable claim under section 78–58–105.

¶ 51 Finally, ADC claims that any application of the SLAPP Act to its conduct would violate the Utah Constitution, including the prohibition against bills of attainder, the open courts clause, the prohibition against impairing the obligation of contracts, and the separation of powers provision. "A bill of attainder is one which imposes guilt, and inflicts punishment, upon an identifiable individual or group without judicial process." *Redwood Gym v. Salt Lake County Comm'n*, 624 P.2d 1138, 1147 (Utah 1981). Applying this definition, we conclude that the SLAPP Act does not constitute an unlawful bill of attainder because it does not impose guilt on ADC without judicial process, but instead merely proscribes "a certain act, and provides civil . . . remedies for a violation thereof." *Id.*

¶ 52 As to ADC's remaining constitutional claims, we decline to address them because ADC has failed to adequately brief them. *See Midvale City Corp. v. Haltom*, 2003 UT 26, ¶ 74, 73 P.3d 334 ("For the court to consider a state constitutional claim, a litigant must at least define the nature of that protection and provide some argument as to how legal precedent supports its position."). Accordingly, we move to Tobias and Feld's emotional distress counterclaims.

## III. TOBIAS AND FELD'S INFLICTION OF EMOTIONAL DISTRESS COUNTERCLAIMS

¶ 53 We next consider whether the district court erred when it granted ADC's motion to dismiss Tobias and Feld's counterclaims for intentional and negligent infliction of emotional distress. In reviewing a district court's decision to grant a motion to dismiss a counterclaim under rule 12(b)(6) of the Utah Rules of Civil Procedure, "we accept the factual allegations in the [counterclaim] as true and consider them, and all reasonable inferences to be drawn from

them, in the light most favorable to the non-moving party." *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 38, 54 P.3d 1054 (internal quotations omitted). "Because the propriety of a 12(b)(6) dismissal is a question of law, we give the [district] court's ruling no deference and review it under a correctness standard." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991).

¶ 54 In dismissing Tobias and Feld's counterclaims for both intentional and negligent infliction of emotional distress, the district court reasoned that none of ADC's alleged conduct "rose to [the] level" of "extreme or outrageous or intolerable conduct." Although the district court erroneously applied the element of outrageous conduct to the counterclaim for negligent infliction of emotional distress, we nevertheless uphold the dismissal of both claims because Tobias and Feld have failed to plead facts sufficient to satisfy the elements of either claim.

### A. Intentional Infliction of Emotional Distress

¶ 55 To state a claim for intentional infliction of emotional distress, a party must plead facts indicating that the defendant

> intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 58, 70 P.3d 17 (internal quotations omitted). A mere "allegation of improper filing of a lawsuit or the use of legal process against an individual" does not state a claim for outrageous or intolerable conduct and, as such, "is not redressable by a cause of action for intentional infliction of emotional distress." *Id.* at ¶ 66.

¶ 56 Tobias and Feld's counterclaim against ADC for intentional infliction of emotional distress is based solely on ADC's initi-

ation and continuation of the lawsuit against them. As stated above, without more, neither the filing of a lawsuit nor the improper use of the legal process is sufficient to support a claim for intentional infliction of emotional distress. Accordingly, Tobias and Feld failed to state a claim for intentional infliction of emotional distress upon which relief can be granted, *see* Utah R. Civ. P. 12(b)(6), and the district court properly granted ADC's motion to dismiss that claim.

### B. Negligent Infliction of Emotional Distress

¶ 57 Unlike a claim for intentional infliction of emotional distress, a claim for negligent infliction of emotional distress does not require proof of outrageous conduct. Rather,

> [i]f the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor
>
> > (a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and
> >
> > (b) from facts known to him, should have realized that the distress, if it were caused, might result in illness or bodily harm.

*Harnicher v. Univ. of Utah Med. Ctr.*, 962 P.2d 67, 69 (Utah 1998) (quoting Restatement (Second) of Torts § 313 (1965)).

¶ 58 As was the case with their claim for intentional infliction of emotional distress, Tobias and Feld based their claim for negligent infliction of emotional distress on ADC's filing and continuation of the lawsuit against them. Whether the act of either filing an improper lawsuit or abusing the legal process is sufficient, without more, to support a claim for negligent infliction of emotional distress is an issue of first impression in this court. In resolving this issue, we first examine the repertoire of claims available to plaintiffs

seeking to remedy abusive litigation and then assess whether the tort of negligent infliction should be added to that repertoire.

¶ 59 As discussed below, we have previously recognized narrowly defined causes of action for wrongful civil proceedings and abuse of process. *See Gilbert v. Ince*, 1999 UT 65, ¶¶ 17, 19, 981 P.2d 841. We acknowledge, however, as have other jurisdictions, that these torts have "the potential to impose an undue 'chilling effect' on the ordinary citizen's willingness to … bring a civil dispute to court, and, as a consequence, the tort[s] ha[ve] traditionally been regarded as … disfavored cause[s] of action." *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal.3d 863, 254 Cal.Rptr. 336, 765 P.2d 498, 501–02 (1989); *see also Dawley v. La Puerta Architectural Antiques*, 133 N.M. 389, 62 P.3d 1271, 1275 (Ct.App.2002) ("[T]he tort of malicious abuse of process must be construed narrowly to protect the right of access to the courts."); *Butera v. Boucher*, 798 A.2d 340, 354 (R.I.2002) ("[T]his Court has viewed abuse-of-process actions with disfavor because they tend to deter the prosecution of crimes and/or to chill free access to the courts." (internal quotations omitted)); *Schmit v. Klumpyan*, 264 Wis.2d 414, 663 N.W.2d 331, 336 (Ct.App.2003) ("Because of its potential chilling effect on the right of access to the courts, the tort of abuse of process is disfavored and must be narrowly construed to insure the individual a fair opportunity to present his or her claim."). Accordingly, it is necessary to ensure that "the elements of the tort[s] [are] carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent" abuse of process or wrongful civil proceeding claim. *Sheldon Appel*, 254 Cal.Rptr. 336, 765 P.2d at 502.[4]

¶ 60 It is against this backdrop that we consider whether to recognize a claim for negligent infliction of emotional distress

---

4. ADC may argue that this narrow view of such torts conflicts with the legislature's policy choice to render parties liable under the SLAPP Act for the filing of abusive litigation. *See supra* ¶ 41. We see no such conflict because the cause of action created by the SLAPP Act is narrowly defined and is limited to those lawsuits filed primarily to harass the defendant and interfere with public participation in the governmental process.

based solely upon the filing of an improper lawsuit. We conclude that it is unnecessary and, in fact, would be ill-advised. It is unnecessary because a plaintiff seeking redress for the filing of such a lawsuit can file a claim for abuse of process or wrongful use of civil proceedings and receive substantially the same recovery. It is ill-advised in light of the tension between the public policy advanced by recognizing such a cause of action and the contrary policy favoring free access to the courts. We see no wisdom in increasing the potential number of torts by which a plaintiff may seek to recover for the same allegedly improper conduct and are concerned that recognizing suits for negligent infliction of emotional distress based solely on the filing of an improper lawsuit may, in fact, chill the filing of meritorious suits. *Cf. Nairon v. Land,* 242 Ga.App. 259, 529 S.E.2d 390, 392 (2000) (rejecting the invitation to extend the tort of negligent infliction of emotional distress to instances of improper use of the legal process based on a concern that it would upset the balance between free access to the courts and the need for a remedy for serious abuse of process); *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215, 1217 (1978) ("[I]t may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability, here malicious prosecution and abuse of process."). Finally, we conclude it would be incongruent to recognize a cause of action for *negligent* infliction of emotional distress based solely on the filing of an improper lawsuit when, as discussed above, we have declined to recognize a cause of action for *intentional* infliction of emotional distress based on the same conduct.

¶ 61 In short, we hold that allegations of abusive litigation, without more, cannot support a claim for negligent infliction of emotional distress. Because Tobias and Feld

have failed to allege any facts beyond ADC's use, or abuse, of the legal process, they have failed to state a cause of action for negligent infliction of emotional distress. Consequently, we hold that the district court properly dismissed their counterclaim for negligent infliction of emotional distress.

## IV. TOBIAS AND FELD'S ABUSE OF PROCESS COUNTERCLAIM

¶ 62 The district court granted ADC's motion for summary judgment on Tobias and Feld's abuse of process counterclaim, ruling, in part, that their failure to succeed on either their motion to dismiss or their motions for summary judgment was fatal to their claim for abuse of process. When reviewing a district court's grant of summary judgment, "we give no deference to the district court's legal decisions and review them for correctness." *Fericks v. Lucy Ann Soffe Trust,* 2004 UT 85, ¶ 10, 100 P.3d 1200.

¶ 63 Confusion surrounding the term "abuse of process" is not uncommon inasmuch as it is often "employ[ed] ... as a catch-all description of any private misuse of judicial resources." *Gilbert v. Ince,* 1999 UT 65, ¶ 17, 981 P.2d 841.[5] To resolve this confusion, we previously outlined the distinctions between a claim for abuse of process and a claim for wrongful civil proceedings, declaring that abuse of process "applies to 'one who uses a legal process ... against another primarily to accomplish a purpose for which it is not designed.'" *Id.* (quoting Restatement (Second) of Torts § 682 (1965) (omission in original)). In contrast, a claim for wrongful use of civil proceedings "consists in instituting or maintaining civil proceedings for an improper purpose and without a justifiable basis." *Id.* at ¶ 19.

¶ 64 On the basis of this distinction, we reiterate today that a party asserting a claim for wrongful use of civil proceedings must demonstrate that (1) the actor initiating the prior proceeding acted " 'without proba-

---

**5.** For example, in *Amica Mutual Insurance Co. v. Schettler,* 768 P.2d 950, 959 (Utah Ct.App.1989), the court of appeals held that, to state a claim for abuse of process, the plaintiff was required to demonstrate that the prior proceeding brought against him terminated in his favor. However, under close examination, it is clear that the court employed the term "abuse of process" when, in reality, it was discussing a tort for wrongful civil proceedings. *See Gilbert,* 1999 UT 65 at ¶¶ 17–19, 981 P.2d 841 (discussing the elements of abuse of process and wrongful civil proceedings).

ble cause, and primarily for a purpose other than that of securing the proper adjudication of the claim' "; and (2) " 'except when they are ex parte, the [prior] proceedings ... terminated in favor of the person against whom they [were] brought.' " *Id.* (quoting Restatement (Second) of Torts § 674).

¶ 65 In contrast, to establish a claim for abuse of process, a claimant must demonstrate " '[f]irst, an ulterior purpose; [and] second, an act in the use of the process not proper in the regular prosecution of the proceedings.' " *Hatch v. Davis*, 2004 UT App 378, ¶ 34, 102 P.3d 774 (quoting *Kool v. Lee*, 43 Utah 394, 134 P. 906, 909 (1913) (further internal quotations omitted)). Unlike a plaintiff asserting a claim for wrongful civil proceedings, a plaintiff in an abuse of process claim is not required to establish that the prior proceeding terminated in his favor or that the proceeding lacked probable cause. *Id.*

¶ 66 In this case, the district court dismissed Tobias and Feld's abuse of process counterclaim at least in part on the ground that they had yet to prevail in the lawsuit filed by ADC. In so doing, the district court erred, applying the standard for a wrongful civil proceeding claim to the abuse of process counterclaim. We therefore remand this issue to the district court to determine whether summary judgment was appropriate in light of the legal principles articulated above.

## V.  PUNITIVE DAMAGES

¶ 67 The last issue we address is whether the district court erred when it granted ADC's motion to dismiss Tobias and Feld's counterclaim for punitive damages.  As stated above, "[b]ecause the propriety of a 12(b)(6) dismissal is a question of law, we give the [district] court's ruling no deference and review it under a correctness standard." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991).

¶ 68 Section 78–18–1 of the Utah Code provides as follows:

> Except as otherwise provided by statute, punitive damages may be awarded only if compensatory or general damages are awarded and it is established by clear and

convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

Utah Code Ann. § 78–18–1(1)(a) (2002).  Because the SLAPP Act provides only for recovery of attorney fees, costs, and compensatory damages, Tobias and Feld are not able to seek punitive damages under that statute. They may, however, seek punitive damages under section 78–18–1 if they are ultimately successful in bringing and proving their abuse of process counterclaim.  Accordingly, we remand to the district court the issue of whether Tobias and Feld may seek punitive damages to be resolved concurrently with the resolution of their counterclaim for abuse of process.

## CONCLUSION

¶ 69 In conclusion, we hold that the district court erred in denying Tobias and Feld's motion for summary judgment on ADC's first and second claims for intentional interference with economic relations because ADC was unable to establish facts sufficient to satisfy an essential element of each claim and Tobias and Feld's actions in petitioning the City Council fall under the *Noerr–Pennington* Doctrine.  We affirm the district court's denial of summary judgment on ADC's third intentional interference with economic relations claim because ADC established a genuine issue of disputed material fact.

¶ 70 With respect to Tobias and Feld's counterclaims, we hold that the district court erred in granting ADC's motion for summary judgment on Tobias and Feld's SLAPP Act counterclaim because Tobias and Feld pled a cognizable claim under section 78–58–105 when they alleged that ADC continued, after enactment of the SLAPP Act, to pursue its lawsuit against them in order to punish them for their opposition to its zoning application. However, we hold that the district court did not err in granting ADC's motion to dismiss Tobias and Feld's counterclaims for intentional and negligent infliction of emotional distress because they failed to allege an element essential to both claims.  Finally, we

remand to the district court for resolution, in light of this opinion, ADC's motion for summary judgment on Tobias and Feld's abuse of process counterclaim and their claim for punitive damages.

¶ 71 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.